AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

| LODGED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 11/3/2020 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____JB_____ DEPUTY |

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| November 3, 2020 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____CD_____ DEPUTY |

UNITED STATES OF AMERICA,

v.

ARTUR AYVAZYAN,
  aka "Arthur Ayvazyan," and
TAMARA DADYAN,

          Defendants.

Case No.     2:20-mj-05321-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendants violated the following statute:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud and Bank Fraud |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____.s. Justin Palmerton_____
*Complainant's signature*

Justin Palmerton, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   November 3, 2020                              _____
                                                      *Judge's signature*

City and state:   Los Angeles, California      Hon. Alka Sagar, U.S. Magistrate Judge
                                                      *Printed name and title*

**Complaint Attachment**

**Statement of Facts Constituting the Offense**

[18 U.S.C. § 1349]

Beginning in or around April 2020 and continuing through at least in or around July 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARTUR AYVAZYAN, also known as "Arthur Ayvazyan" ("A. AYVAZYAN"), and defendant TAMARA DADYAN ("DADYAN"), together with others known and unknown, conspired to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud in violation Title 18, United States Code, Section 1344.  The objects of the conspiracy were carried out, and to be carried out, in substance as follows:

Defendants A. AYVAZYAN and DADYAN, and their co-conspirators, would apply for Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan Program ("EIDL") loans.  Defendants A. AYVAZYAN and DADYAN, and their co-conspirators, would submit false and fictitious documents in support of the PPP and EIDL loan applications.  Defendants A. AYVAZYAN and DADYAN, and their co-conspirators, would direct that the PPP and EIDL loan proceeds be deposited into bank accounts that defendants A. AYVAZYAN and DADYAN, and their co-conspirators, controlled.  Defendants A. AYVAYZAN and DADYAN, and their co-conspirators, would use the fraudulently obtained PPP and EIDL loan proceeds for their own personal benefit, including for expenses prohibited under the requirements of the PPP and EIDL programs.

1

## AFFIDAVIT

I, Justin Palmerton, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2018.  I am currently assigned to a Los Angeles Field Division White Collar Crimes Squad, which is responsible for investigating complex financial crimes.  Prior to being employed by the FBI as a Special Agent, I was employed as a Certified Public Accountant at a public accounting firm.  My roles and responsibilities included financial statement audits, tax return preparation and accounting consulting work.

2.   Since becoming an FBI Special Agent in 2018, I have received 21 weeks of formal training at the FBI Training Academy in Quantico, Virginia.  During the time I have been employed by the FBI, I have participated in investigations relating to wire fraud, mail fraud, and various types of complex financial crimes.  I have participated in many aspects of criminal investigations including reviewing evidence, analyzing financial documents, conducting physical and electronic surveillance, working with informants, and executing search and arrest warrants.

## II. PURPOSE OF AFFIDAVIT

3.   This affidavit is made in support of a criminal complaint against, and arrest warrants for, ARTUR AYVAZYAN (born 1980), also known as "Arthur Ayvazyan" ("A. AYVAZYAN"), and

TAMARA DADYAN (born 1981) ("DADYAN") for violations of 18 U.S.C. § 1349 (Conspiracy to Commit Bank and Wire Fraud).

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.     Beginning in or around April 2020 and continuing through at least in or around July 2020, A. AYVAZYAN and DADYAN, who are married and reside together at Address 1, submitted fraudulent applications through various lenders and the Small Business Administration ("SBA") to obtain disaster relief loans authorized by the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.  A. AYVAZYAN and DADYAN directed the fraudulently obtained disaster relief loan proceeds to accounts that they owned and/or controlled.  A. AYVAZYAN and DADYAN improperly used those funds for their own personal benefit rather than for the business expenses for which the loan applications certified they would be used.  A. AYVAZYAN and DADYAN also conspired with Richard Ayvazyan ("R. Ayvazyan") and Marietta Terabelian ("Terabelian"), who were previously charged with violation of 18 U.S.C. § 1349 (Conspiracy to Commit Wire and Bank Fraud), as

described in the criminal complaint and supporting affidavit, which was sworn and signed on October 20, 2020, in <u>United States v. Ayvazyan et al</u>, No. 2:20-MJ-5081 (the "Terabelian Complaint").  As further described below and in the Terabelian Complaint, the government's investigation has revealed that A. AYVAYZAN and DADYAN directed at least some of the fraudulently obtained disaster relief loan proceeds to R. Ayvazyan and Terabelian, who are married, to assist with the purchase of at least one residential property - Residential Property 1 - for $3,250,000.  R. Ayvazyan is A. AYVAZYAN's brother and Terabelian is A. AYVAZYAN's sister-in-law.  Using disaster relief loan proceeds for an individual's personal benefit, including as part of a down payment on a residence, is also fraudulent and violates the requirements for these programs.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

6.    Based on witness interviews I have conducted, my review of documents obtained from third parties, reports of interviews conducted by other law enforcement officers, conversations with other law enforcement officers, and publicly filed documents, I know the following:

**A.    The Paycheck Protection Program ("PPP")**

7.    The CARES Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job

retention and certain other expenses, through the PPP.  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

8.   In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

9.   A PPP loan application must be processed by a participating financial institution (the lender).  If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

10.  PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on

mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time and uses a certain percentage of the PPP loan proceeds on payroll expenses.

**B.    The Economic Injury Disaster Loan Program ("EIDL")**

11.  The EIDL program is an SBA program that provides low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

12.  The CARES Act authorized the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

13.  In order to obtain an EIDL and advance, a qualifying business must submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020. The applicant must also certify that all of the information in the application is true and correct to the best of the applicant's knowledge.

14.  EIDL applications are submitted directly to the SBA and processed by the agency with support from a government contractor.  The amount of the loan, if the application is approved, is determined based, in part, on the information provided by the application about employment, revenue, and cost

of goods, as described above.  Any funds issued under an EIDL or advance are issued directly by the SBA.  EIDL funds can be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtains a loan under the PPP, the EIDL funds cannot be used for the same purpose as the PPP funds.

### C.   Fraudulent PPP Loan Application Submitted on Behalf of Allstate Towing

15.  Based on my review of loan documents provided by Lender 1, which is an FDIC-insured financial institution, I know that on or about May 2, 2020, Lender 1 received a PPP loan application in the name of Allstate Towing and Transport LLC ("Allstate Towing") seeking a PPP loan in the amount of $124,000.  The application was submitted in the name of A. AYVAZYAN, who described himself as a Director of Allstate Towing.  A. AYVAZYAN listed Address 1 as his residential address.  Based on my review of identity documents, open source research, and surveillance conducted by federal agents, A. AYVAZYAN currently resides at Address 1 with his wife, DADYAN.

16.  Based on my review of loan documents provided by Lender 1, A. AYVAZYAN completed and signed a PPP Borrower Application Form on behalf of Allstate Towing.  The PPP Borrower Application Form represented that Allstate Towing had 11 employees, that its average monthly payroll was $49,600, and that the purpose of the PPP loan was to cover its payroll.

17.  A. AYVAZYAN made several certifications, including that Allstate Towing "was in operation on February 15, 2020 and

had employees for whom it paid salaries and payroll taxes or
paid independent contractors."

18. Based on my review of loan documents provided by
Lender 1, A. AYVAZYAN submitted several documents in support of
Allstate Towing's PPP loan application, including:

a. IRS Form 940 for 2019, in which he represented
that Allstate Towing had paid $546,000 to its employees in 2019.
On the form, A. AYVAZYAN listed himself as Allstate Towing's
owner.

b. IRS Form 941 for the first quarter of 2020, in
which he represented that Allstate Towing had paid $136,500 to
its employees. On the form, A. AYVAZYAN again listed himself as
Allstate Towing's owner.

19. Allstate Towing's PPP loan application contained
materially false and misleading statements, including, but not
limited to, that Allstate Towing had 11 employees. A. AYVAZYAN
also falsely certified that, on February 15, 2020, Allstate
Towing had employees for whom it paid salaries and payroll taxes
or paid independent contractors. I reviewed records provided by
the California Employment Development Department ("CA EDD") and
learned that there were no records of Allstate Towing having any
employees, for the period January 2019 to October 5, 2020.

20. In addition, the IRS Forms 940 and 941 that A.
AYVAZYAN submitted with the Allstate Towing PPP application
appear to be fraudulent. The IRS has confirmed that these
returns were not filed with the IRS. In fact, Allstate Towing

had not filed employment tax or federal income tax returns with the IRS in 2019 or 2020.

21.  Based on my review of loan documents provided by Lender 1, I know that it approved Allstate Towing's PPP application and funded the loan.  According to records provided by Lender 1 and Financial Institution 1, on or about May 5, 2020, Lender 1 transferred via interstate wire $124,000 to a Financial Institution 1 account ending 5135 in the name of Allstate Towing, for which A. AYVAZYAN was the sole signatory.

22.  Based on my review of records provided by Financial Institution 2, on May 9, 2020, A. AYVAZYAN opened Financial Institution 2 account ending 7695 in the name of Allstate Towing.  I know that A. AYVAZYAN was the sole signatory.  On or around May 21, 2020, A. AYVAZYAN transferred via interstate wire $80,000 from Allstate Towing's Financial Institution 1 account ending 5135 to Allstate Towing's Financial Institution 2 account ending 7695.  The description of the wire stated that it was a "Business S Transfer for Payroll Payroll."  At the time A. AVAZYAN transferred the fraudulently obtained PPP loan proceeds, Financial Institution 2 account ending 7695 had only $5,300 on deposit.

23.  A. AYVAZYAN did not use the funds for payroll, as he had represented in the PPP loan application he submitted to Lender 1.  Based on my review of records provided by Financial Institution 2, I know that, on or about June 3, 2020, A. AYVAZYAN transferred via interstate wire $93,000 (which included the $80,000 in fraudulently obtained PPP loan proceeds)

8

from Allstate Towing's Financial Institution 2 account ending
7695 to Encore Escrow, Inc. for "Escrow Number 16951-JP. Richard
Ayvaz//an [sic]."  I reviewed records provided by Encore Escrow,
Inc. and determined that the $93,000 wired from Financial
Institution 2 account ending 7365 went into an escrow account to
fund a portion of a down-payment on the purchase of Residential
Property 1 in the name of R. Ayvazyan and Terabelian.  The
purchase price of this property was $3,250,000.

24.   Using disaster relief loan proceeds for an
individual's personal benefit, including as part of a down
payment on a residence, is fraudulent and violates the
requirements for PPP loans.

### D.   Fraudulent EIDL Loan Application Submitted on Behalf of Allstate Towing

25.   Based on my review of information provided by the SBA,
the SBA received an application in the name of Allstate Towing
seeking an EIDL loan in the amount of $150,000.  The application
was electronically submitted in the name of A. AYVAZYAN via the
SBA's online portal.  In the application, A. AYVAZYAN listed
Address 1, his residential address, as Allstate Towing's
business address.

26.   In the application, A. AYVAYZAN represented that
Allstate Towing had 12 employees.  As described above in
paragraphs 19-20, evidence gathered in the government's
investigation revealed that this statement is false.

27.   The SBA approved Allstate Towing's application and
funded the loan.  On or about July 13, 2020, the SBA transferred

via interstate wire $149,900 to Allstate Towing's Financial Institution 2 account ending 7695, for which A. AYVAZYAN is the sole signatory.

**E.      Fraudulent PPP Loan Applications Submitted on Behalf of Secureline Realty**

28.   The government's investigation revealed that two PPP applications were submitted to FDIC-insured financial institutions on behalf of Secureline Realty and Funding, Inc. ("Secureline Realty").

29.   Based on my review of loan documents provided by Lender 2, which is an FDIC-insured financial institution, I know that on or about April 22, 2020, Lender 2 received a PPP loan application in the name of Secureline Realty, seeking a PPP loan in the amount of $122,838.  The application was submitted in the name of DADYAN, who purported to be Secureline Realty's owner. DADYAN listed Address 1 as Secureline Realty's business address and her residential address.

30.   Based on my review of loan documents provided by Lender 3, which is an FDIC-insured financial institution, I know that on or about May 9, 2020, Lender 3 also received a PPP loan application in the name of Secureline Realty, seeking a PPP loan in the amount of $137,500.  The application was submitted in the name of DADYAN, who purported to be Secureline Realty's owner. DADYAN listed Address 1 as Secureline Realty's business address and her residential address.

31.   Based on my review of loan documents provided by Lender 2 and Lender 3, DADYAN completed and signed a PPP

Borrower Application Forms on behalf of Secureline Realty.  Both
PPP Borrower Application Forms represented that Secureline
Realty had 8 employees and that the purpose of the PPP loan was
to cover its payroll.

32.  DADYAN made several certifications in both
applications, including that Secureline Realty "was in operation
on February 15, 2020 and had employees for whom it paid salaries
and payroll taxes or paid independent contractors."

33.  DADYAN also certified that she was not the owner of
any other business and that she did not manage any other
business.

34.  In addition, DADYAN submitted several documents in
support of Secureline Realty's PPP loan application to Lender 2,
including:

      a.  IRS Form 940 for 2019, in which she represented
that Secureline Realty had paid $589,623 to its employees in
2019.  On the form, DADYAN listed her residential address as
Secureline Realty's business address.

      b.  IRS Form 941 for the first quarter of 2020, in
which she represented that Secureline Realty had paid $151,842
to its employees.  On the form, DADYAN again listed her
residential address as Secureline Realty's business address.

      c.  A payroll report purported to have been prepared
using "Gusto," which represented that, in 2019, Secureline
Realty had 8 employees and average monthly payroll costs of
$52,075.

35.   The government's investigation has revealed that both
Secureline Realty PPP loan applications contained materially
false and misleading statements, including, but not limited to,
that Secureline Realty had 8 employees.  DADYAN also falsely
certified that, on February 15, 2020, Secureline Realty had
employees for whom it paid salaries and payroll taxes or paid
independent contractors.  I reviewed records provided by the CA
EDD and learned that there were no records of Secureline Realty
having any employees, for the period January 2019 to October 5,
2020.

36.   In addition, the IRS Forms 940 and 941 that DADYAN
submitted with the Secureline Realty PPP loan application to
Lender 2 appear to be fraudulent.  The IRS has confirmed that
these returns were not filed with the IRS.  In fact, Secureline
Realty had not filed employment tax or federal income tax
returns with the IRS in 2019 or 2020.

37.   In addition, on the PPP application to Lender 2,
Secureline Realty is listed as having the Employer
Identification Number ("EIN") "61-2105827"; however, on the PPP
application to Lender 3, Secureline Realty represents the EIN as
"45-3539141".  Records from the IRS revealed that EIN 61-2105827
is invalid.  Based on my training and experience, individuals
utilize different EIN numbers when submitting fraudulent
applications for multiple PPP and EIDL loans in order to avoid
having the applications flagged as duplicative and therefore
increase the likelihood they are approved and funded.

38.  DADYAN's representation that she was not the owner of any other business and did not manage any other business, was also false and misleading.  In truth, DADYAN owned or controlled at least two other companies that also applied for disaster relief loans, including Green Label Nutrienrs ("Green Label"), for which she listed herself as owner, and ABC Realty Advisors, Inc. ("ABC Realty"), for which she was listed as President. Green Label and ABC Realty both had applied separately for and received hundreds of thousands of dollars in disaster relief loan funds.  DADYAN's false and misleading representation had the effect of concealing her ownership or control of these companies and their receipt of these funds.

39.  Based on my review of records provided by Lender 2, I know that it approved Secureline Realty's application and funded the loan.  On or about May 7, 2020, Lender 2 transferred via interstate wire $122,838 to a Financial Institution 3 bank account ending 1754 in the name of Secureline Realty.  I know that DADYAN is the sole signatory for this account.  At the time Lender 2 transferred the fraudulently obtained PPP loan proceeds, the Financial Institution 3 account ending 1754 had only $24.74 on deposit.

40.  Records provided by Financial Institution 3 showed that the $122,838 in PPP loan proceeds wired to Financial Institution 3 account ending 1754, were not used to pay employees through a payroll processor or otherwise, but were withdrawn by DADYAN.  Specifically, on or about June 12, 2020, DADYAN made an in-branch withdrawal in the amount of $120,010,

13

the entirety of the withdrawal appeared to consist of PPP funds. Additionally, I reviewed the bank records from January 2020 to July 31, 2020 and found no evidence that Secureline Realty had employees for whom it paid wages.

41.   Based on my review of records provided by Lender 3, I know that it approved Secureline Realty's application and funded the loan.   On or about May 11, 2020, Lender 3 transferred via interstate wire $137,500 to a Financial Institution 4 account ending 8935 in the name of Secureline Realty.   At the time Lender 3 transferred the fraudulently obtained PPP loan proceeds, the Financial Institution 4 account ending 8935 had only $123.35 on deposit.

42.   Records provided by Financial Institution 4 showed that the $137,500 in PPP loan proceeds wired to Financial Institution 4 account ending in 8935, were not used to pay employees through a payroll processor or otherwise, but were withdrawn by DADYAN.   Specifically, on or about May 26, 2020, a check for $136,000, addressed to "Tamara Dadyan or ABC Realty Advisors Inc.", was drawn on the account for "Payroll."   The entirety of the check appears to have been derived from fraudulently obtained PPP funds.   Additionally, I reviewed the bank records from January 2020 to July 31, 2020 and found no evidence that Secureline Realty had employees for whom it paid wages.

43.   Based on my review of records provided by Financial Institution 5, I know that on or about May 27, 2020, $136,000 was deposited into Financial Institution 5 account ending 8366

14

in the name of ABC Realty Advisors, Inc. I know that DADYAN is
the sole signatory on this account. At the time DADYAN deposited
the fraudulently obtained PPP loan proceeds, Financial
Institution 5 account ending 8366 had only $2,110.23 on deposit.

44.  I know that on or about June 12, 2020, $120,000 was
deposited into Financial Institution 5 account ending 8366.

45.  There is probable cause to believe that the May 27,
2020 and June 12, 2020 deposits in the Financial Institution 5
account are the fraudulently obtained disaster relief loan funds
withdrawn from the Financial Institution 4 account ending 8935
on or about May 26, 2020 and the Financial Institution 3 account
ending 1754 on or about June 12, 2020, respectively.

46.  Based on my review of records provided by Financial
Institution 5, I know that, on or about June 17, 2020, DADYAN
transferred $200,000 from Financial Institution 5 account ending
8366, to Financial Institution 2 account ending 4043 in the name
of Inception Ventures Inc.  Based on records provided by
Financial Institution 2, I know that R. Ayvazyan is the sole
signatory for account ending 4043.

47.  Records provided by Financial Institution 2 show that
on or about June 22, 2020, R. Ayvazyan transferred via
interstate wire $435,000 ($200,000 of which were the SBA funds
provided by DADYAN) to an account owned by Encore Escrow, Inc.
I reviewed records provided by Encore Escrow and determined
these funds were used to fund a portion of a down-payment on the
purchase of Residential Property 1 in the name of R. Ayvazyan
and Terabelian.

15

**F.    Fraudulent PPP Loan Applications Submitted on Behalf of ABC Realty**

48.   Based on my review of loan documents provided by Lender 4, which is an FDIC-insured financial institution, I know that on or about April 16, 2020, Lender 4 received a PPP loan application in the name of ABC Realty, seeking a PPP loan in the amount of $117,938.  The application was submitted by an individual purporting to be Person 1, who is DADYAN's brother.

49.   The application represented that ABC Realty had 8 employees and that the purpose of the PPP loan was to cover its payroll.

50.   The application certified that ABC Realty "was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors."

51.   The application also certified that DADYAN, the owner, was not the owner of any other business and that she did not manage any owner business.

52.   In addition, several documents were submitted in support of ABC Realty's PPP loan application to Lender 4, including:

a.   IRS Form 940 for 2019, in which it was represented that ABC Realty had paid $589,623 to its employees in 2019.

b.   IRS Form 941 for the first quarter of 2020, in which it was represented that ABC Realty had paid $151,842 to its employees.

16

53.   The government's investigation has revealed that ABC Realty's PPP loan application contained materially false and misleading statements, including, but not limited to, that ABC Realty PPP had 8 employees.  It also falsely certified that, on February 15, 2020, ABC Realty was in operation and had employees for whom it paid salaries and payroll taxes or paid independent contractors.  I reviewed records provided by the CA EDD and learned that there were no records of ABC Realty having any employees, for the period January 2019 to October 5, 2020.

54.   In addition, the IRS Forms 940 and 941 submitted with the ABC Realty PPP loan application to Lender 4 appear to be fraudulent.  All of the figures reported in the ABC Realty Form 940 for 2019 and Form 941 for the first quarter of 2020 were identical to those reported in the fake IRS Forms 940 and 941 that DADYAN submitted to Lender 2 in support of Secureline Realty's PPP loan application.  In addition, records from the IRS confirm that these returns had not been filed with the IRS. In fact, ABC Realty had not filed employment tax or federal income tax returns with the IRS in 2019 or 2020.

55.   The representation that DADYAN was not the owner of any other business and did not manage any other business, was also false and misleading because, as explained above in paragraph 38, she owned and/or controlled at least two other businesses.

56.   Based on my review of records provided by Lender 4, I know that it approved ABC Realty's application and funded the loan.  On or about May 4, 2020, Lender 4 transferred via

17

interstate wire $117,938 to Financial Institution 2 account ending 2061 in the name of ABC Realty.  I know that DADYAN is the sole signatory.  At the time Lender 4 transferred the fraudulently obtained PPP loan proceeds, Financial Institution 2 account ending 2061 had only $615.25 on deposit.  Approximately $80,000 of the funds were used to pay large checks made out to individuals and companies believed to be involved in the conspiracy.

* * * *

57.  Based on the above information, there is probable cause to believe that A. AYVAZYAN and DADYAN together, and with others known and unknown, knowingly combined, conspired, confederated, and agreed to submit, and caused to be submitted, fraudulent loan applications to various financial institutions and the SBA, seeking funds through the PPP and EIDL programs, and improperly used those funds for their own personal benefit rather than for the business expenses for which the loan applications certified they would be used.

///

///

///

## V.  <u>CONCLUSION</u>

58.  For all the reasons described above, there is probable cause to believe that A. AYVAZYAN and DADYAN violated 18 U.S.C. § 1349 (Conspiracy to Commit Bank and Wire Fraud).


/s/ Justin Palmerton
_____
Justin Palmerton
Special Agent
Federal Bureau of
Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __3rd__h day of
November, 2020.

_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE