TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
    1100/1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6527/3819
    Facsimile: (213) 894-6269/0141
    E-mail:   Scott.Paetty@usdoj.gov/Brian.Faerstein@usdoj.gov

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
    1400 New York Avenue NW, 3rd Floor
    Washington, DC 20530
    Telephone: (202) 320-0539
    Facsimile: (202) 514-0152
    E-mail:   Christopher.Fenton@usdoj.govv

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-579(A)-SVW |
|---|---|
|        Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT A. AYVAZYAN'S AND DEFENDANT T. DADYAN'S MOTION TO SUPPRESS (ECF 149); DECLARATIONS OF CHRISTOPHER FENTON AND TIMOTHY MASSINO; EXHIBITS |
|           v. | |
| RICHARD AYVAZYAN, <br>  aka "Richard Avazian" and <br>    "Iuliia Zhadko," <br>MARIETTA TERABELIAN, <br>  aka "Marietta Abelian" and <br>    "Viktoria Kauichko," <br>ARTUR AYVAZYAN, <br>  aka "Arthur Ayvazyan," and <br>TAMARA DADYAN, <br>MANUK GRIGORYAN, <br>  aka "Mike Grigoryan," and <br>    "Anton Kudiumov," <br>ARMAN HAYRAPETYAN, <br>EDVARD PARONYAN, | Hearing Date: April 12, 2021 <br>Hearing Time: 11:00 a.m. <br>Location:   Courtroom of the <br>           Hon. Stephen V. <br>           Wilson |

   aka "Edvard Paronian" and
      "Edward Paronyan," and
VAHE DADYAN,

            Defendants.

     Plaintiff United States of America, by and through its counsel

of record, the Acting United States Attorney for the Central District

of California and Assistant United States Attorneys Scott Paetty and

Brian Faerstein, and United States Department of Justice Trial

Attorney Christopher Fenton, hereby files its Opposition to defendant

Artur Ayvazyan's and defendant Tamara Dadyan's Motion to Suppress

(ECF No. 149).

     This opposition is based upon the attached memorandum of points

and authorities, the Declaration of Christopher Fenton and attached

//

//

exhibits, the Declaration of Timothy Massino, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 22, 2021          Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
SCOTT PAETTY
BRIAN FAERSTEIN
Assistant United States Attorneys
CHRISTOPHER FENTON
Department of Justice Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                    PAGE

I.     INTRODUCTION ...................................................... 1

II.    STATEMENT OF FACTS ................................................ 2

       A.    The Investigation ......................................... 2

       B.    Firearm Possession and Ties to Organized Crime........... 4

       C.    The Complaints........................................... 6

       D.    The Search Warrant ...................................... 6

       E.    The Search............................................... 9

III.   ARGUMENT ......................................................... 12

       A.    The Search Warrant Is Sufficiently Particular........... 14

       B.    The Search Warrant Is Not Overbroad ..................... 17

       C.    The Execution of the Search Warrant Was Reasonable....... 19

       D.    No Evidence Should Be Excluded Because the Agents
             Acted in Good Faith ..................................... 20

       E.    The Government Obtained an Order Extending Its Time to
             Review Digital Devices for Responsiveness ............... 21

IV.    CONCLUSION ....................................................... 21

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

**Federal Cases**

Horton v. California,
    496 U.S. 128 (1990) ......................................... 19

Illinois v. Gates,
    462 U.S. 213 (1983) ......................................... 19

United States v. Adjani,
    452 F.3d 1140 (9th Cir. 2006) ............................... 13

United States v. Banks,
    556 F.3d 967 (9th Cir. 2009) ................................ 13

United States v. Fannin,
    817 F.2d 1379 (9th Cir. 1987) ............................... 14

United States v. Gourde,
    440 F.3d 1065 (9th Cir. 2006) ............................... 19

United States v. Hayes,
    794 F.2d 1348 (9th Cir. 1986) ............................... 14

United State v. Holzman,
    871 F.2d 1496 (9th Cir. 1989) ............................... 19

United States v. Leon,
    468 U.S. 897 (1984) ..................................... 20, 21

United States v. Riley,
    906 F.2d 841 (2d Cir. 1990) ................................. 14

United States v. Rude,
    88 F.3d 1538 (9th Cir. 1996) ................................ 13

United States v. SDI Future Health, Inc.,
    568 F.3d 684 (9th Cir. 2009) ................................ 14

United States v. Spilotro,
    800 F.2d 864 (9th Cir. 1986) ............................ 13, 14

**Federal Statutes**

15 U.S.C. § 645(A) ............................................... 7

18 U.S.C. § 1014 ................................................. 7

18 U.S.C. § 1028A ................................................ 7

18 U.S.C. § 1343 ................................................. 7

18 U.S.C. § 1344 ................................................. 7

ii

## **TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                                     <u>PAGE</u>

18 U.S.C. § 1349 .................................................  7

18 U.S.C. §§ 1956 (a), (h)  ........................................  7
\

1

I.    **INTRODUCTION**

2       The warrant at issue authorized the search of an Encino

3  residence used in connection with a massive scheme to fraudulently

4  obtain millions of dollars in COVID-19 disaster relief funds using

5  fake and stolen identities and business names.  The defendants who

6  lived there – Artur Ayvazyan ("A. Ayvazyan") and his wife Tamara

7  Dadyan ("T. Dadyan") – had a history of possessing firearms and ties

8  to the "Armenian Power" gang.  Law enforcement took measures to

9  protect officer safety, including to have an FBI SWAT team initially

10 secure the property.  The safety precautions proved necessary: agents

11 seized an arsenal of 12 firearms, ammunition and empty magazines.

12      Agents also seized an overwhelming amount of evidence showing

13 defendants' role in the fraud, including driver's licenses, social

14 security cards, credit cards, and personally identifiable information

15 for dozens of fake, stolen, and synthetic identities, many of which

16 were used to apply for COVID-19 disaster relief loans; fraudulent

17 COVID-19 disaster relief loan applications; and blank checks and bank

18 records for fake and stolen businesses, including businesses that

19 applied for COVID-19 disaster relief loans.  Agents also found

20 evidence related to the creation of fraudulent documents, including

21 official-looking rubber stamps purportedly belonging to California

22 state and federal courts, including the Clerk for the United States

23 Bankruptcy Court for the Central District of California.

24      Defendants do not dispute that the warrant was sufficiently

25 particular and narrow to permit the seizure of the overwhelming

26 evidence showing their role in the fraud.  Defendants only

27 specifically challenge the government's seizure of (i) defendant A.

28 Ayvazyan's truck GPS systems (which may contain evidence of his

travels to locations used as part of the scheme); and (ii) an envelope of $2,100 in cash that defendant T. Dadyan claims belonged to her daughter (but that was found in a safe alongside a plastic grocery bag stuffed with an additional $12,500 in cash and defendants' passports).

The search warrant was amply supported by probable cause, and was executed in a targeted fashion by law enforcement agents who acted pursuant to the terms of the warrant in a professional manner and with good faith that the warrant, which was authorized by U.S. Magistrate Judge Alka Sagar, was valid.  For all of these reasons, the Court should deny defendants' motion to suppress.

## II.  STATEMENT OF FACTS

### A.    The Investigation

In June 2020, the government opened an investigation into a Los Angeles-based ring that was using stolen, fake, and synthetic identities to fraudulently apply for COVID-19 relief funds. (Declaration of Timothy Massino ("Massino Decl.") ¶ 1.)  Over the next four months, the government served over 200 subpoenas, obtaining information from federal and state agencies, lenders, retail banks, and escrow companies, among others.  (Id. ¶ 2.)  The investigation identified dozens of fraudulent loan applications that had been submitted on behalf of fake businesses or businesses whose identities had been stolen.  (See generally ECF 1 ("Ayvazyan Compl."); United States v. Dadyan, et al., 20-mj-5321 (filed Nov. 3, 2020), ECF 1 ("Dadyan Compl.").)  Defendants A. Ayvazyan and T. Dadyan submitted some of these fraudulent applications using their own names; others they and their co-conspirators submitted using fake or stolen identities.  (See generally Ayvazyan Compl., Dadyan Compl.)  The

2

investigation further revealed that fraudulent documents had been submitted in support of the applications, including fake driver's licenses, federal tax forms, payroll reports, and bank statements. (Affidavit, In the Matter of the Search of [REDACTED] Encino California 91316, No. 2:20-MJ-05286 ("SW Aff.") ¶¶ 29, 41-42, 50.)

The investigation determined that four residences were being used in connection with fraud, including SUBJECT PREMISES-4, which is where defendants A. Ayvazyan and T. Dadyan reside. (SW Aff. ¶¶ 8-11, 17, 39, 47, 52.) The investigation revealed that these four addresses were used in connection with the fraudulent loan applications or with the bank accounts used to receive and launder the criminal proceeds, or both. (Id.) For example, SUBJECT PREMISES-4 was listed as the business address for Allstate Towing and Transport LLC and Secureline Realty and Funding Inc., which, together, fraudulently applied for over $500,000 in disaster relief loans. (SW Aff. ¶ 39; Dadyan Compl. ¶¶ 15-47.)

Law enforcement agents traced the funds and learned that a substantial amount of the proceeds had been laundered through various bank accounts and had been used by defendant A. Ayvazyan's brother, defendant Richard Ayvazyan ("R. Ayvazyan"), and sister-in-law, defendant Marietta Terabelian, to purchase three luxury properties. (Ayvazyan Compl. ¶¶ 5, 16-26, 27-33; Dadyan Compl. ¶¶ 5, 23-24, 47; SW Aff. ¶¶ 5-7, 23, 26-29, 34.) The investigation also revealed that a substantial portion of the stolen disaster relief funds had been funneled through various bank accounts, and that large amounts of the funds had not yet been located and were believed to have been liquidated to cash. (SW Aff. ¶¶ 62.f-g.)

Law enforcement agents began conducting surveillance on the seven properties, including, in some instances, to search the trash left outside for pickup. (SW Aff. ¶¶ 25, 32-33, 35, 38, 43-44, 59.) The surveillance yielded additional evidence that further confirmed the relationship between the properties and their use as part of the fraud. For example, at SUBJECT PREMISES-4, agents found:

- a copy of a California driver's license for "T.G.," which was confirmed to be a fraudulent document;

- a social security card for "T.G.";

- an earnings statement for "T.G." from "Crystalcare Home Health, Inc.," which had applied for a PPP loan using the name of T. Dadyan's brother, A.D.;

- a FedEx Airbill for "EM Construction," which had applied for an EIDL loan using the name "A.Z.";

- a closing letter for a real estate transaction addressed to "Anton Kudiumov," which is a synthetic identity that was used to apply for numerous PPP and EIDL loans; and

- correspondence from one of the lenders through which Secureline Realty applied for a PPP loan.

(SW Aff. ¶¶ 43-44.)

**B.  Firearm Possession and Ties to Organized Crime**

As part of its investigation, law enforcement conducted background checks which revealed that, in 2012, defendants R. Ayvazyan and Terabelian both pled guilty to conspiracy to commit bank fraud for their role in a four-year scheme to defraud several financial institutions. (See United States v. Ayvazyan, et al., CR 11-180-CJC (CDCA).) At the time that he pled guilty, defendant R. Ayvazyan owned at least five firearms including: one Taurus Forjas 38

4

Caliber Revolver; one semi-automatic Carl Walther P99 Pistol; one semi-automatic Kie Kimber Pistol; one semi-automatic Sig Sauer Pistol; and one Smith and Wesson Revolver.  (Declaration of Christopher Fenton ("Fenton Decl.") ¶ 1, Ex. 1.)  After entering his plea, he purportedly sold or transferred his firearms to defendant A. Ayvazyan (id.), who lived with defendant T. Dadyan.  In addition, a background check on A. Ayvazyan as of October 27, 2020, showed that he had previously owned at least one semi-automatic Carl Walther P99 Pistol.  (Id. ¶ 2, Ex. 2.)

Surveillance also revealed that defendants had ties to known associates of the "Armenian Power" gang.  For example, on October 5, 2020, surveillance identified an individual believed to be defendant T. Dadyan leaving one of the properties defendants had purchased using fraudulently obtained disaster relief funds in a black Mercedes SUV registered to A.P.  (SW Aff. ¶¶ 35-37.)  A.P. is defendant R. Ayvazyan's brother-in-law and purported business partner.  (Id.)  In 2013, A.P. pled guilty to racketeering conspiracy charges related to the "Armenian Power" criminal enterprise.  (Id. (referencing United States v. Darbinyan, et al., 11-cr-72, ECF 2598).)  Specifically, A.P. admitted he was an associate of the "Armenian Power" gang and had abetted the illegal possession of a firearm by one of the gang's leaders.  (Id.)

Two days after the individual believed to be defendant T. Dadyan had been seen leaving the property driving A.P.'s Mercedes SUV, law enforcement agents searched the trash outside and found empty packages of carbine rifle attachments to include a CTR Stock, an AR-15 pistol grip attachment, a carbine handguard, and a carbine charging handle.  (SW Aff. ¶ 38; Fenton Decl. ¶ 3, Ex. 3.)  An empty

box of 9mm ammunition was also discovered along with various pieces
of mail with the identifying information removed.  (Id.)

As discussed below, when executing the search warrants for
SUBJECT PREMISES-4, among others, an FBI SWAT team made the initial
entrance to secure the properties and ensure the safety of the
officers who would conduct the searches.  These steps proved
necessary: at SUBJECT PREMISES-4, as described further below, agents
found and seized an arsenal of 12 firearms, including four rifles,
two shotguns, and six handguns (pistols and revolvers).  (Fenton
Decl. ¶ 4, Ex. 4.)  The searching agents also found ammunition, empty
magazines, and a gun safe.  (Id. ¶¶ 5-6, Exs. 5, 6.)

**C.   The Complaints**

On October 20, 2020, the government filed a complaint against
defendants R. Ayvazyan and Terabelian.  (See Ayvazyan Compl.)  On
November 3, 2020, the government filed a complaint against defendants
A. Ayvazyan and T. Dadyan.  (See Dadyan Compl.)  The complaints
summarized in detail the evidence establishing probable cause that
defendants R. Ayvazyan, Terabelian, A. Ayvazyan, and T. Dadyan
participated in a massive conspiracy to commit wire fraud and bank
fraud.  The complaints detailed the manner and means of the
conspiracy (repeated fraudulent applications for disaster relief
loans), provided specific examples of fraudulent loan applications
defendants had submitted, and traced the flow of disaster relief
funds, which showed that these funds had been used to purchase luxury
residential properties.

**D.   The Search Warrant**

On November 3, 2020, the same day the government filed a
complaint against defendants A. Ayvazyan and T. Dadyan, the

6

government obtained a warrant to search SUBJECT PREMISES-4, which was defendants A. Ayvazyan's and T. Dadyan's residence.  The search warrant was authorized by the Honorable Alka Sagar, United States Magistrate Judge, based on an affidavit sworn out by FBI Special Agent Justin Palmerton.  The affidavit incorporated by reference the Ayvazyan Complaint and attached a copy as an exhibit.  (SW Aff. ¶ 20; Ex. 1.)  The warrant authorized the search of SUBJECT PREMISES-4, which was the residential property described in Attachment A-4, for items described in Attachment B.

Attachment B limited the agents' discretion to search by clearly identifying the criminal activity being investigated and by providing an express limitation on the relevant time period.

The first sentence of Attachment B states: "[t]he items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1344 (Bank Fraud); 18 U.S.C. § 1349 (Conspiracy to Commit Wire and Bank Fraud); 18 U.S.C. §§ 1956(a) and (h) (Money Laundering and Conspiracy to Commit Money Laundering); 18 U.S.C. § 1014 (False Statements to a Financial Institution); 18 U.S.C. § 1028A (Aggravated Identity Theft); and 15 U.S.C. § 645(A) (False Statements to the Small Business Administration) ... occurring on or after January 1, 2020."

Attachment B then lists specific items to guide the agents conducting the search to determine what they have the authority to seize.  The items clearly relate to the fraudulent scheme, which is straightforward: defendants submitted fraudulent loan applications using fake and stolen identities, laundered the proceeds and spent the money for their personal benefit.

For example, the first item to be seized includes records relating to the names of the fake and stolen businesses used to fraudulently apply for loans and launder and misuse the proceeds. (Attachment B ¶ 1.a.)  A similar item to be seized includes records relating to the names of the fake, stolen and synthetic individual identities used to fraudulently apply for loans and launder and misuse the proceeds (id. ¶ 1.d), including records concerning the creation, maintenance, or use of these aliases (id. ¶ 1.e).

The following items to be seized include related requests, such as:

- records concerning the PPP, EIDL, or other SBA or commercial loan programs (id. ¶ 1.b);

- records concerning PPP or EIDL loan applications and supporting documentation (id. ¶ 1.c); and

- records concerning the creation, alteration, falsification, or use of such supporting documentation (id. ¶ 1.i).

The warrant also authorized the seizure of banking and financial records for the specific individuals and entities involved in the fraudulent scheme, which relates both to the falsity of the claims made in the fraudulent loan applications concerning the applying companies' business activities and operations, and the laundering and spending of loan proceeds: "Banking and financial records for any bank, credit card, and brokerage or investment accounts associated with RICHARD AYVAZYAN, ARTHUR AYVAZYAN, MARIETTA TERABELIAN, TAMARA DADYAN, ANNA MANUKYAN, or any of the other individuals and entities described herein in Attachment B."  (Id. ¶ 1.m.)

The warrant also provides for the seizure of cash in amounts greater than $1,000 because: (i) "[i]ndividuals who commit financial

8

crimes including loan fraud will often liquidate criminal proceeds to cash ... in order to launder the proceeds and profit from the crimes"; and (ii) in this particular case, there remains a large amount of proceeds that law enforcement has not yet located, that defendants could use to flee the jurisdiction. (Attachment B ¶ 1.r; SW Aff. ¶¶ 62.f-g.)

Attachment B also provides that agents may seize digital devices found on defendants A. Ayvazyan and T. Dadyan, or at SUBJECT PREMISES-4 (Attachment B ¶¶ 1.t-u, 3-8), based on several of the affiant's statements about the role that digital devices play in the scheme, including that: "[e]vidence of digital and virtual submissions, such as the fraudulent PPP and EIDL loan applications, are likely to be stored on digital devices that subjects were using to apply for these loans and direct the transfer of the funds." (SW Aff. ¶ 62.a). Attachment B also sets forth special procedures relating to the search of digital devices, including permitting the agents who conduct the search to seize and transport the digital devices offsite for examination. (Attachment B ¶¶ 4-8.)

### E.   The Search

On November 5, 2020, at around 6:00 a.m., law enforcement executed the search warrant on SUBJECT PREMISES-4. In light of concerns about firearms and links to "Armenian Power," an FBI SWAT team initially entered the property to secure it and ensure the safety of the officers who would conduct the actual search. (Massino Decl. ¶¶ 3-6.) To protect officer safety, the SWAT team disabled security cameras. (Id.) The presence of a tactical unit and disabling of security cameras are commonly used methods to protect law enforcement agents when executing warrants. (Id. ¶ 6.) Recent

events underscore the importance of these tactics for officer safety. For example, on the morning of February 2, 2021, two FBI special agents were shot and killed while serving a warrant on a child pornographer who is believed to have monitored the approach of the agents with a doorbell camera and ambushed the agents through the unopened door with an assault-style rifle.[1]

Pursuant to the authorized arrest warrants, defendant A. Ayvazyan and T. Dadyan were taken into custody and transported from SUBJECT PREMISES-4. (Fenton Decl. ¶ 7, Ex. 7.) After it secured the property, the SWAT team turned control of the search site over to the search team for the execution of the search warrant. (Id.) The agents who conducted the search seized only 42 items from SUBJECT PREMISES-4. (Fenton Decl. ¶ 4, Ex. 4.) More than one-third of the seized items (15 out of 42) were firearms or firearm accessories. (Id.) Specifically, agents seized an arsenal of 12 firearms, ammunition, and empty magazines, including two Berretta Shotguns, one Savage Rifle with scope, one Henry Repeating Rifle, one Tikka T3X Rifle with scope, one Mossberg Rifle, one Berretta 9MM Pistol, one Smith and Wesson .357 Magnum Pistol, one Colt .45 Pistol, two .38 Special Taurus Revolvers, and one Titan .25 Pistol. (Id.)[2]

---

[1] See, e.g., "2 FBI agents killed, three wounded while serving warrant. Gunman, now dead, shot them through the door," Miami Herald, Feb. 3, 2021, available at www.miamiherald.com/news/local/crime/article248942479.html.

[2] Around 14 of the items seized were comprised of records and other documents. Some of the records within some of these items were organized in multiple folders.

Agents also seized items evidencing defendant A. Ayvazyan's and defendant T. Dadyan's possession and use of dozens of fake, stolen and synthetic identities to commit fraud, including:

- dozens of unauthorized and counterfeit access devices, such as fake and stolen California driver's licenses, social security cards, and credit cards, including for individuals whose names were used to fraudulently apply for PPP and EIDL loans (Fenton Decl. ¶ 8, Ex. 8);

- handwritten and typed lists of personally identifiable information ("PII") for fake, stolen and synthetic identities, including for names used in furtherance of the fraud (id. ¶ 9, Ex. 9);

- lists of "EMAILS FOR BORROWERS," which were lists of email addresses created for fake, stolen and synthetic identities used to apply for fraudulent loans (id. ¶ 10, Ex. 10);

- fraudulent PPP and EIDL loan applications using T. Dadyan's name and the names of other individuals (id. ¶ 11, Ex. 11);

- blank checks and other records for accounts that received PPP and EIDL funds, including blank checks signed by "T.T," who is recently deceased (id. ¶ 12, Ex. 12); and

- official looking rubber stamps, including stamps for the Clerk of the United States Bankruptcy Court for the Central District of California, Los Angeles Registrar-Recorder/County Clerk, the Los Angeles Superior Court, and numerous notaries (id. ¶ 13, Ex. 13).

Defendants A. Ayvazyan and T. Dadyan were also in possession of digital devices believed likely to contain evidence of the fraud including iPhones, iPads, laptop and desktop computers, and truck GPS

11

1   systems.  (Fenton Decl. ¶ 4, Ex. 4.)  Agents seized all of these

2   devices for off-site inspection, as permitted by the warrant.

3   (Attachment B ¶ 4.a.)  The GPS systems potentially contained evidence

4   relating to defendants' travel to and from the seven residences used

5   in connection with the fraud, as well as travel to and from other

6   locations that may contain evidence or proceeds.

7        Finally, agents seized a single valuable: $14,600 in U.S.

8   currency found in a safe alongside defendants' passports.  A portion

9   of the money - $2,100 – was in a pink envelope; the rest was in a

10  plastic grocery bag.  (Fenton Decl. ¶ 14, Ex. 14.)  The cash was in

11  an amount greater than $1,000 and thus subject to seizure pursuant to

12  the warrant authorized by Judge Sagar.  (Attachment B ¶ 1.r.)  As

13  discussed above, there was probable cause to believe such sizeable

14  amounts of cash were proceeds from the massive fraud, a large portion

15  of which had not yet been located.[3]  (SW Aff. ¶¶ 62.f-g.)  There was

16  also reason to believe the cash was evidence of defendants' plans and

17  wherewithal to leave the jurisdiction, which, as the affidavit

18  states, is particularly common for perpetrators of financial crimes

19  of the magnitude being investigated in this case.  (Id.)

20  III. **ARGUMENT**

21       The Fourth Amendment concepts of particularity and overbreadth

22  are distinct.  "Particularity is the requirement that the warrant

23  must clearly state what is sought.  Breadth deals with the

24

25

26

27

28       [3] The remainder of the items seized are all similarly within the
scope of the search warrant, which is amply supported by probable
cause in all respects.

requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." United States v. Banks, 556 F.3d 967, 972-73 (9th Cir. 2009) (citation omitted).

With respect to particularity, a warrant "need only be reasonably specific, rather than elaborately detailed." United States v. Rude, 88 F.3d 1538, 1551 (9th Cir. 1996) (citation omitted). Specificity is a case-specific determination and "varies depending on the circumstances of the case and the type of items involved." Id. (quoting United States v. Spilotro, 800 F.2d 959, 963 (9th Cir. 1986)).

The Ninth Circuit generally considers three factors when determining whether a warrant is sufficiently particular: "(1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued." United States v. Adjani, 452 F.3d 1140, 1148 (9th Cir. 2006) (quoting Spilotro, 800 F.2d at 963)).

Notably, "[w]arrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." Spilotro, 800 F.2d at 963. As the Second Circuit explained, even though descriptions of categories of documents to be seized, including illustrations, may not "eliminate all discretion of the officers executing the warrant, . . . the particularity requirement is not so exacting . . . The Fourth Amendment is not violated because the officers executing the

1   warrant must exercise some minimal judgment as to whether a

2   particular document falls within the described category." United

3   States v. Riley, 906 F.2d 841, 844-45 (2d Cir. 1990).

4        As for overbreadth, the Ninth Circuit has explained that a

5   "warrant must not only give clear instructions to a search team, it

6   must also give legal, that is, not overbroad, instructions." United

7   States v. SDI Future Health, Inc., 568 F.3d 684, 702 (9th Cir. 2009).

8   Under the Fourth Amendment, "this means that there [must] be probable

9   cause to seize the particular thing[s] named in the warrant." Id.

10  (citation omitted). "The number of files that could be scrutinized .

11  . . is not determinative.  The search and seizure of large quantities

12  of material is justified if the material is within the scope of the

13  probable cause underlying the warrant." United States v. Hayes, 794

14  F.2d 1348, 1355 (9th Cir. 1986).

15       A warrant that, standing on its own, might be overbroad may

16  still be valid when one of three factors are satisfied: (1) the

17  warrant describes in "detail the items one commonly expects to find

18  on premises used for the criminal activities in question," or (2) the

19  warrant refers to specific criminal activities, or (3) a descriptive

20  affidavit is attached to and incorporated in the warrant.  United

21  States v. Fannin, 817 F.2d 1379, 1384 (9th Cir. 1987) (citing

22  Spilotro, 800 F.2d at 864, 867).

23       **A.   The Search Warrant Is Sufficiently Particular**

24       While contending that the search warrant was "unconstitutionally

25  lacking in particularity," defendants do not allege any particular

26  facts or law underlying their specific challenge, other than

27  incorporating by reference the motion to suppress filed by

28

14

1    codefendants R. Ayvazyan and Terabelian.[4]  (ECF 149 at 10.)  Nor do

2    defendants specifically challenge the seizure of any of the numerous

3    documentary items found at their residence evidencing the extensive

4    fraudulent scheme alleged in the search warrant affidavit.

5         Indeed, as described above, at SUBJECT PREMISES-4, agents seized

6    overwhelming evidence showing defendants' involvement in the alleged

7    fraud.  The evidence seized included dozens of unauthorized and

8    counterfeit access devices, such as fake and stolen California

9    driver's licenses, social security cards, and credit cards, including

10   for individuals whose name were used to fraudulently apply for PPP

11   and EIDL loans; lists of PII for fake, stolen and synthetic

12   identities; lists of email addresses created for fake, stolen and

13   synthetic identities used to apply for fraudulent loans; PPP and EIDL

14   loan applications; blank checks and other records for accounts that

15   received PPP and EIDL funds; and items used in the creation of

16   fraudulent documents such as rubber stamps for California state and

17   federal courts.  All of these items related directly to the

18   fraudulent scheme alleged in the search warrant affidavit: defendants

19   used fake and stolen identities to fraudulently apply for disaster

20   relief loans on behalf of sham companies that do not actually have

21   business operations or activities.  Defendants then laundered the

22   funds through bank accounts belonging to these and other sham

23   companies and used them for their personal benefit.

24

25

26   _____

27        [4] Rather than repeat the government's response to defendants R.
     Ayvazyan and Terabelian's motion to suppress evidence seized from
     SUBJECT PREMISES-1, for the sake of efficiency, the government
28   incorporates its opposition to that motion by reference here (ECF
     188).

1    Instead, defendants A. Ayvazyan's and T. Dadyan's argument is

2  that "[t]he opening paragraph of the [w]arrant renders the rest of

3  the document irrelevant by defining all items and records related to

4  [defendants] [A.] Ayvazyan and [T.] Dadyan (or either of their co-

5  defendants) as 'evidence' to be seized."  (ECF 149 at 8.)

6    Defendants' argument is based on factual inaccuracies.  The

7  paragraph defendants challenge is not the "opening paragraph" as

8  defendants claim, but the first item to be seized.  This is a fatal

9  flaw in defendants' argument because the opening paragraph sets forth

10 key criteria relevant to the particularity analysis:  it articulates

11 the specific crimes under investigation by reference to statute and

12 prescribes the relevant time-frame (i.e., January 1, 2020 through the

13 present).  The items that follow provide the searching agents with

14 specific illustrations of the types of records they should seize in

15 light of this limiting criteria.

16    In addition, in adopting wholesale codefendants R. Ayvazyan's

17 and Terabelian's arguments, defendants misquote the paragraph at

18 issue and apply a hyper-technical interpretation of the misquoted

19 language in an effort to arrive at an absurd result.  (ECF 149 at 8.)

20 Defendants claim the paragraph instructs agents to seize all

21 "[r]ecords or items [concerning Ayvazyan and/or Dadyan's business or

22 a series of businesses affiliated with Ayvazyan, Dadyan, and their

23 co-defendants], or any affiliated ... individuals." (Id. (purportedly

24 quoting Attachment B ¶ 1.a).)  In reality, the paragraph instructs

25 agents to seize records relating to the sham companies involved in

26 fraudulently obtaining and laundering disaster relief proceeds,

27 specifically:

28

Records or items concerning ABC Realty Advisors, Allstate Towing and Transport, Crystalcare Home Health, EM Construction, Fadehaus Barbershop, Fiber One Media, G&A Diamonds, Inception Fund, Journeymen Construction, Nelson's Nursery, Redline Auto Mechanics Inc., Runyan Tax Services, Secureline Realty and Funding, Timeline Transport, VB Trucking, TM Events, Top Quality Contracting, or any affiliated entities or individuals;

(Attachment B ¶ 1.a.)

In any event, this argument has no practical import here because defendants do not actually challenge the seizure of any particular <u>records</u> related to A. Ayvazyan or T. Dadyan.  Nor can they.  All of these records were properly seized because the records were responsive to items listed in Attachment B that were sufficiently particular and defendants do not argue otherwise.  (<u>Compare</u> Fenton Decl. ¶ 11, Ex. 11, <u>with</u> Attachment B ¶¶ 1.b-c; Fenton Decl. ¶ 8, Ex. 8, <u>with</u> Attachment B ¶ 1.d; Fenton Decl. ¶ 12, Ex. 12, <u>with</u> Attachment B ¶ 1.m).

## B.    The Search Warrant Is Not Overbroad

Defendants' challenges to the breadth of the search warrant focus only on the seizure of two truck GPS systems and $14,600 in cash.  Defendants' arguments fail on this ground as well.

Defendants' challenge to the seizure of the truck GPS systems is based on their argument that the affidavit did not allege that criminal proceeds had been used to purchase the devices.  (ECF 149 at 10.)  The agents, however, did not seize the truck GPS systems for the reason that defendants state; rather, they seized the truck GPS systems because the truck GPS systems were believed to be "digital devices" that were properly within the scope of the search warrant and had evidentiary value.  As explained above, the search warrant authorized by Judge Sagar expressly provided for the seizure of

17

"digital devices" (Attachment B ¶ 1.t-u), which is defined to include "any electronic system or device capable of storing or processing data in digital form." (Id. ¶ 3.) Truck GPS systems fit squarely within that definition because such devices store and process digital data relating to travel, including address books and travel routes. Here, such information is relevant because the alleged conspiracy involves the use of at least seven residences in and around Los Angeles, as alleged in the search warrant affidavit. (SW Aff. ¶¶ 5-11, 17, 23, 26-29, 34, 39, 47, 52.)

Defendants also argue that the search warrant was overly broad because it permitted seizure of $14,600 in cash, $2,100 of which was contained in a pink envelope that purportedly belonged to defendants' daughter. (ECF 149 at 10.) Defendants claim that the warrant was overbroad because the affidavit did not contain allegations specifically linking their daughter's money with the allege scheme. Defendants are wrong. The affidavit established probable cause to seize all cash greater than $1,000 based on the statements that: (i) "[i]ndividuals who commit financial crimes including loan fraud will often liquidate criminal proceeds to cash ... in order to launder the proceeds and profit from the crimes"; and (ii) "the criminal conduct [in this case] involves a large amount of fraud proceeds, a large portion of which, at this point, law enforcement has not been able to locate." (SW Aff. ¶¶ 62.f-g.) The affidavit need not have contained detailed allegations with respect to the source of funds for each aggregation of cash so long as that aggregated amount exceeded $1,000. Rather, the affidavit, which alleges the specific crimes of money laundering and a conspiracy to commit money laundering, provides ample evidence that there is a fair probability that

defendants engaged in a massive scheme to steal and launder millions of dollars, and that a "large amount" of that money has not yet been identified and that some portion of that money was at SUBJECT PREMISES-4.[5]  (See, e.g., SW Aff. ¶¶ 3, 20-21, 62.b-d, f-g; Ayvazyan Compl. ¶¶ 22, 26, 40.)  This is more than sufficient to establish probable cause to seize the envelope of cash, which was found in a safe alongside a plastic grocery bag of additional cash in the amount of $12,500.  See United State v. Holzman, 871 F.2d 1496, 1509 (9th Cir. 1989), abrogated on other grounds by Horton v. California, 496 U.S. 128 (1990) ("[B]ecause the affidavit described the large quantities of cash carried by appellants at the time of their arrest, and that counterfeit credit cards were being used to obtain cash advances, we are satisfied that probable cause existed to support the search for cash.").[6]

## C.   The Execution of the Search Warrant Was Reasonable

Defendants' argument that the execution of the warrant was "unprecedented in its flagrant disregard" for defendants and their family is based on the false claim they posed "no threat of

---

[5] Determinations of probable cause must be upheld if, under the "totality of the circumstances" surrounding a request, the issuing magistrate had a substantial basis for finding probable cause. Illinois v. Gates, 462 U.S. 213, 238-39 (1983).  The "totality of circumstances" test requires only a "fair probability" that the sought-after evidence is located in a particular place.  United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) (citing Gates, 462 U.S. 213 at 246).).  "Fair probability" does not require "certainty or even a preponderance of the evidence."  Id.

[6] As also explained in the affidavit, the possession of travel documents and cash can be evidence of "perpetrator's plans to leave the jurisdiction, which is particularly common for perpetrators of financial crimes of the magnitude being investigated in this case." (SW Aff. ¶ 62.g.)  Here, the pink envelope and plastic grocery bag filled with cash were found in a safe next to defendants' passports. (Fenton Decl. ¶ 14, Ex. 14.)

violence." (ECF 149 at 3-6.) Defendants, however, did pose a threat of violence because they had a history of firearm possession and ties to the "Armenian Power" gang. And this concern was further confirmed when, upon searching SUBJECT PREMISES-4, the agents found and seized an arsenal of 12 firearms, live ammunition, and empty cartridges.

Moreover, there was nothing "unprecedented" about the way law enforcement handled the search of SUBJECT PREMISES-4: as explained above, law enforcement commonly uses a tactical unit and disables security cameras when executing warrants, particularly under circumstances such as those presented here. (Massino Decl. ¶ 6.)

Defendants also challenge the reasonableness of the search based on their claim that the "[a]gents appear to have seized anything that looked like it was valuable without probable cause." (ECF 149 at 7.) This is patently false. Agents seized only the $14,600 in cash, which was expressly permitted by the search warrant authorized by Judge Sagar based on the ample probable cause finding set forth in the affidavit. (Attachment B ¶ 1.r; SW Aff. ¶¶ 62.f-g.) No other item believed to be worth a great deal of money was seized.[7]

### D.   No Evidence Should Be Excluded Because the Agents Acted in Good Faith

In the context of a search warrant, the evidence obtained by law enforcement is still admissible where agents relied in good faith on the validity of the warrant issued by a neutral magistrate. <u>See</u>

---

[7] Defendants argue that it was unreasonable to seize a portion of the cash - $2,100 of the $14,600 — because it purportedly belonged to their daughter and represented money given to her for her birthday. To the contrary, it was reasonable for the agents to seize this large amount of cash because (i) it was found in a safe along with a plastic grocery bag of cash and defendants' passports, not in the daughter's bedroom, and (ii) it was a large amount of cash and thus eligible for seizure pursuant to the warrant.

1 United States v. Leon, 468 U.S. 897, 923 (1984).  Under Leon, agents

2 conducting a search pursuant to a validly issued warrant are entitled

3 to rely on the search warrant unless: (1) "the magistrate or judge in

4 issuing a warrant was misled by information in an affidavit that the

5 affiant knew was false or would have known was false except for his

6 reckless disregard for the truth;" (2) "the issuing magistrate wholly

7 abandoned his judicial role;" (3) the warrant was "based on an

8 affidavit so lacking in indicia of probable cause as to render

9 official belief in its existence entirely unreasonable;" or (4) the

10 warrant failed to "particularize the place to be searched or things

11 to be seized."  Id.  Here, defendants do not allege any basis to

12 support a finding that the search warrant was not validly issued.

13 Accordingly, the Court should conclude that the agents acted in good

14 faith and deny defendants request to suppress evidence.

15        **E.  The Government Obtained an Order Extending Its Time to**
**Review Digital Devices for Responsiveness**

16

17     Defendants' argument that all digital devices not marked

18 responsive by March 5, 2021 should be returned regardless of

19 suppression is based on the original 120 day deadline set forth in

20 Attachment B of the search warrant.  (ECF 149 at 11-12.)  Defendants'

21 argument is moot, however, because the government properly sought and

22 obtained an order extending the deadline to complete the review by

23 another 120 days.  As set forth in the order, the government now has

24 until July 3, 2021 to complete its review for responsiveness.  See

25 Order, In re Search Warrants, No. 2:20-mj-05286.

26 **IV.  CONCLUSION**

27     For the foregoing reasons, the government respectfully requests

28 that this Court deny defendants' motion to suppress.