TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
CATHERINE AHN (Cal. Bar No. 248286)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
    1100/1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6527/2424/3819
    Facsimile: (213) 894-6269/0141
    E-mail:    Scott.Paetty@usdoj.gov
               Catherine.S.Ahn@usdoj.gov
               Brian.Faerstein@usdoj.gov

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
    1400 New York Avenue NW, 3rd Floor
    Washington, DC 20530
    Telephone: (202) 320-0539
    Facsimile: (202) 514-0152
    E-mail:  Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:20-cr-579(A)-SVW-4 |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO PRESENTENCE INVESTIGATION REPORT FOR TAMARA DADYAN |
| v. | |
| TAMARA DADYAN, | Sentencing: October 25, 2021 |
| Defendant. | Time:        11:00 a.m. |
| | Location:    Courtroom of the Hon. Stephen V. Wilson |

1    Plaintiff United States of America, by and through its counsel

2 of record, the Acting United States Attorney for the Central District

3 of California, Assistant United States Attorneys Scott Paetty,

4 Catherine Ahn, and Brian Faerstein, and Department of Justice Trial

5 Attorney Christopher Fenton, hereby files its initial response,

6 pursuant to Federal Rule of Criminal Procedure 32(f), to the

7 Presentence Investigation Report ("PSR"), prepared by the United

8 States Probation and Pretrial Services Office ("Probation"), for

9 defendant TAMARA DADYAN ("defendant") (ECF 959).

10    The government respectfully submits that the PSR should be

11 amended to include the following two enhancements necessary to

12 reflect the scope of defendant's crimes and conduct for which she was

13 convicted, including: (1) a three-level aggravating role adjustment

14 based on the fact that she was a supervisor/organizer of otherwise

15 extensive criminal activity in accordance with U.S.S.G. § 3B1.1(b);

16 (2) a two-level enhancement because the offenses involved the

17 possession of 5 or more means of identification that unlawfully were

18 produced from, or obtained by the use of, another means of

19 identification in accordance with U.S.S.G. § 2B1.1(b)(11)(C)(i) and

20 (ii); and (3) a two-level victim-related adjustment based on the fact

21 that many of her victims were vulnerable and could not protect

22 against her use of their name in accordance with U.S.S.G.

23 § 3A1.1(b)(1).  If included, these enhancements result in a seven-

24 level increase in defendant's Guidelines calculation from 31 to 38,

25 resulting in an overall Guidelines range of 235 to 293 months'

26 imprisonment.  The government concurs with the PSR's determination of

27 defendant's Criminal History Category.

28

**The PSR Should Apply a Three-Level Aggravating Role Enhancement Because Defendant was a Supervisor/Organizer**

Defendant, along with co-defendant Richard Ayvazyan, directed, managed, and supervised the extensive criminal activity involved in (1) developing the identification and supporting documents necessary to submit the fraudulent Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL") applications; (2) obtaining and directing the resulting fraudulent proceeds through additional accounts to purchase assets and distribute the proceeds to co-conspirators; and (3) handling individuals recruited into the conspiracy.

Defendant's close involvement in developing the identification and supporting documents necessary to submit fraudulent PPP and EIDL applications is extensively shown through the evidence seized from her phone, her husband and co-defendant Artur Ayvazyan's phone, the evidence seized from her and Artur Ayvazyan's home (the "Weddington residence"), and through the text messages exchanged between herself and co-defendant and brother-in-law Richard Ayvazyan, among other things.

First, the evidence seized from the Weddington residence, combined with the evidence on her and her husband Artur Ayvazyan's phone, shows defendant's role in helping to identify and develop the synthetic identities to use in the PPP and EIDL fraud.

For example, the evidence the government seized from the Weddington residence shows how defendant targeted foreign exchange students and visitors in order to steal their names for use in the fraud.  Customs and Border Patrol ("CBP") records showed that defendant and her co-conspirators stole and used the names and

3

identities of foreign students and visitors who had traveled to and left the United States years before COVID-19.  (See e.g., GEX 57.c, GEX 116 (charts summarizing, among other things, PPP and EIDL applications submitted in the names of Iuliia Zhadko, Viktoria Kauichko, and Anton Kudiumov) and GEX 44.)  The government found copies of numerous visas, including J-1 (student) visas (GEX 57.c at 1, 3, and 5-8), matching social security work authorizations, and passports in the names of individuals other than defendants, including the name of Anastasiya Rysik (GEX 57.c at 8-10), at the Weddington residence.  The government also found the front and back of purported California Driver's Licenses ("CADLs") and social security cards in names matching the stolen J-1 foreign exchange student identities.  This included count 24's identity theft victim Anna Dzukaeva (GEX 57.a at 1-2), and three copies of a CADL bearing the name Liudmyla Kopytova with two different photos, as well as a purported social security card bearing her name (id. at 1-2, 7-10). Papers with images of identification documents and handwritten notes regarding modification and use of personal identifiers, addresses, emails, and passwords (GEX 57.b at 3 and 5-7), as well as photographs of faces used in fraudulent CADLs (id. at 8), were further seized from the Weddington residence.

A comparison of the evidence found on defendant's phone with her husband's Artur Ayvazyan's phone reveals how Artur Ayvazyan followed defendant's instructions to develop fraudulent identification documents.[1]  For example, a copy of a social security card and a CADL

---

[1] During his trial testimony, Artur Ayvazyan denied knowledge of the incriminating evidence on his phone but testified repeatedly that - based on his knowledge of defendant's handwriting from their

*(footnote cont'd on next page)*

1  bearing the name Anna Dzukaeva were found on Artur Ayvazyan's phone.

2  (GEX 24b at 1-2.)  However, Artur Ayvazyan also possessed images of a

3  second CADL bearing the name Anna Dzukaeva but a different photograph

4  were further found on his phone, indicating that at least one of the

5  CADLs was fraudulent.  Artur Ayvazyan's phone further contained

6  images related to the creation of identification documents, including

7  images of CADLs with similar handwritten instructions on how to

8  modify the identification document, along with a matching, new CADL

9  image bearing different photographs and contact information in

10  accordance with the instructions, but the same name.  (See GEX 24a.)

11  These handwritten instructions appeared to match the writing that

12  Artur Ayvazyan testified belonged to defendant, and were found in

13  defendant's office in their home.  (See GEX 24a at 16-19; see also

14  GEX 57.f and 6/23/2021 A.M. Tr. 90:11-22 and 87:25-11-15 (testimony

15  of Artur Ayvazyan).)  Notably, one of the fraudulent Anna Dzukaeva

16  CADL images found on both defendant and Artur Ayvazyan's phones was

17  used in an PPP application submitted on behalf of Six Star Farms in

18  the name of Anna Dzukaeva.  (GEX 2-q at 29.)  Defendant's phone

19  further contained screenshots confirming that an EIDL application had

20  been submitted using the email address "Annadzukaeva@mail.com".  (GEX

21  13b at 3-4 and GEX 13d at 6.)

22      Second, defendant helped identify and direct the flow of

23  fraudulent proceeds to and from other members of the conspiracy,

24  including Artur Ayvazyan and her cousin and co-defendant, Vahe

25  Dadyan.  For example, in text messages to Richard Ayvazyan, defendant

26  _____

27  sixteen years of marriage – many of the handwritten notes related to
   the creation and use of identification documents found at the
   Weddington residence were written in defendant's handwriting.  (See,

28  e.g., 6/23/21 A.M. Transcript at 90:7-90:20 (identifying handwriting
   on GEX 57.b at 3 as belonging to defendant.)

informed him that she's "expecting a wire for Art for $73,500" (see GEX 10 at 18 (text message 3504)), and provides an image showing a wire transfer from New Acre Farm Produce and "Thanh P. Tran" to "Runya (sic) Tax Service" for the purported purpose of "Payroll New Acre Farm Produce." (6/21/21 P.M. Tr. 71:4-75:2 and GEX 10, attachment 24 ("10-24")[2].)

This receipt corresponded to bank account records for New Acre Farms showing an incoming PPP wire transfer for $210,000. (GEX 110 at 21.) An image of the same wire receipt was also found on Artur Ayvazyan's phone (GEX 24e at 4), along with images of the front and back of Tran's California Driver's License ("CADL") (GEX 24c at 27-28). Furthermore, 35% of the $210,000 PPP loan is exactly $73,500 — corresponding to the "35 percent for ppp" that "Art" was going to discuss with another individual to be recruited into submitting fraudulent PPP applications, further described below. (GEX 10 at 17 (text message 3479).) Defendant was also assiduous in trying to identify methods by which Richard Ayvazyan could send her cousin Vahe Dadyan his share of the fraudulent PPP proceeds referenced in text messages sent by defendant. (See GEX 10 at 16 (text message 3371) ("Send em the account number again so I have Art go deposit the 157k Vahe") and GEX 10 at 19-21.) Moreover, handwritten notes found in defendant's home office show her directing the movement of criminal proceeds through accounts in the names of various individuals and companies. (GEX 57.f.) Paragraphs 41 and 42 of the PSR describe other instances where defendant directed money laundering activities, such that defendant's aggravating role adjustment would also be

---

[2] Hereinafter, attachments to GEX 10 will be referenced by a dash, as in "10-24" for GEX 10 attachment 24.

appropriate for her supervisory and organizing role in the "laundering of criminally derived funds" under U.S.S.G. § 2S1.1.  See U.S.S.G. § 2S1.1 cmt. n.2(C).

Third, defendant was involved in directing and managing additional co-conspirators.  The text messages alone show defendant directly managing at least three individuals – co-defendant Vahe Dadyan, co-defendant and husband Artur Ayvazyan, and at least one unindicted co-conspirator.  For example, on or about July 2, 2020, defendant informed Richard Ayvazyan that, "Tom coming over now I told art show him the decline letter from the eidl and it's simple it's 35 percent for ppp."  (GEX 10 at 18 (text message 3479).)  Defendant was further involved in helping co-defendant Richard Ayvazyan develop and manage the submission of and flow of funds from at least 151 PPP and EIDL applications, whose submission involved coordination with and management of numerous other co-conspirators.

Based on the information described above, which illustrates the significant supervisory and management role defendant played in this extensive criminal conduct, the government is requesting a three-level aggravating role enhancement.  Providing a three-level aggravating role enhancement to defendant would reflect her integral part in the criminal conspiracies, while recognizing the larger share claimed by Richard Ayvazyan and his wife, Marietta Terabelian, and defendant's reliance on direction from Richard Ayvazyan in executing her role in the crimes.[3]  (See U.S.S.G. § 3B1.1 Cmt. App. Note 4.)

---

[3] The government has requested a four-level enhancement for Richard Ayvazyan because his role as leader was even more extensive than defendant's.  (See ECF 964 at 4-5; see also GEX 115, 116, and GEX 10, including text message 3011 (Richard Ayvazyan telling defendant, "No I told you I have the freaking formula").)

1    **The PSR Should Apply a Two-Level Enhancement for the Possession of Five or More Means of Identification Unlawfully Produced or**
2    **Obtained by Another Means of Identification**

3    Defendant's offense level should be further increased another

4    two levels pursuant to one or both of U.S.S.G. § 2B1.1(b)(11)(C)(i)

5    and (ii).  Specifically, a two-level enhancement applies under these

6    sections where "the offense involved . . . (C)(i) the unauthorized

7    transfer or use of any means of identification unlawfully to produce

8    or obtain any other means of identification, or (ii) the possession

9    of 5 or more means of identification that unlawfully were produced

10   from, or obtained by the use of, another means of identification."

11   USSG §2B1.1(b)(11)(C)(i), (ii).  A means of identification is "any

12   name or number that may be used, alone or in conjunction with any

13   other information, to identify a specific individual."  18 U.S.C. §

14   1028(d)(7).  Section 1028(d)(7) provides non-exhaustive examples of

15   means of identification, including:  "(A) name, social security

16   number, date of birth, official State or government issued driver's

17   license or identification number, alien registration number,

18   government passport number, employer or taxpayer identification

19   number;" or "(C) unique electronic identification number, address, or

20   routing code."  18 U.S.C. § 1028(d)(7)(A), (C).  The application

21   notes to § 2B1.1 provide further examples contemplating that both an

22   account number of a bank loan and a credit card are themselves means

23   of identification.  See U.S.S.G. §2B1.1 cmt. n.10(C)(ii)(I), (II);

24   see also U.S.S.G. §2B1.1, cmt. background ("Because 18 U.S.C.

25   § 1028(d) broadly defines "means of identification", the new or

26   additional forms of identification can include items such as a

27   driver's license, a credit card, or a bank loan."); United States v.

28   Melendrez, 389 F.3d 829, 834 (9th Cir. 2004) (finding the enhancement

applicable where the defendant had used stolen social security numbers to create false forms of identification).[4]

As described above, defendant possessed at the Weddington residence and on her phone numerous means of identification that were (a) used in support of creating fraudulent CADLs and/or (b) obtaining debit and credit cards in the names of the stolen or synthetic identities.  For example, defendant texted numerous means of identification for Mykhail Diuzhenko to Richard Ayvazyan, including a photograph of his CADL and Social Security card, a photograph of the front and back of a Visa Wells Fargo Business Platinum Debit card bearing the same name and a business entity in whose name the conspirators submitted fraudulent PPP and EIDL applications ("MD Acquisition Serv"), and later texted a screenshot of a Wells Fargo SBA Lending Promissory Note and Agreement in the name of Mykhail Diuzhenko with the message, "Who's ur dadddy (sic) baby".  (GEX 10-30, 10-31, 10-32 and GEX 10 at 25 (text message 3949 and GEX 10-37).) Diuzhenko's name was further used in a fraudulent IRS form 940 and Gusto payroll forms submitted with a fraudulent EIDL application in Diuzhenko's name on behalf of MD Acquisition Services.  (GEX 3.1 at 1-3, 7-10).  Notably, the same Diuzhenko CADL and Social Security card texted by defendant to Richard Ayvazyan was found on her husband Artur Ayvazyan's phone, along with numerous images of another CADL bearing Diuzhenko's name but a different photograph.  (GEX 24b at 11-14.)

---

[4] The application notes to § 2B1.1 further provide that "means of identification" has the meaning given that term in 18 U.S.C. § 1028(d)(7), "except that such means of identification shall be of an actual (i.e., not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct)."  U.S.S.G. §2B1.1 cmt. n.1.

1    The text messages further show defendant and Richard Ayvazyan's
2    efforts to use the names and other means of identification of
3    numerous other individuals to open bank accounts in support of her
4    offenses of conviction.  For example, defendant describes using the
5    identity of "alak" to submit fraudulent loan applications, noting
6    "Let's go the fool is dead on armo land" when Richard Ayvazyan noted
7    his credit score.  (See GEX 10 at 9 (text messages 2944-2973).)  When
8    asked if she had accounts in his name, defendant responds, "Yes
9    wells" followed by a message titled "You're one step away from
10   receiving Paycheck Program Program funds.png."  (Id.)  This deceased
11   individual's name is further referenced later in the text message
12   conversation when defendant attempts to open a corporate account for
13   Alak, asking, "Rich what bank can I open Corp account without going
14   to branch" and "There is the new alak Corp we got buy (sic) the
15   stupid wells online shit said come to branch".  (GEX 10 at 20 (text
16   messages 3594-3595).)  Defendant's success in establishing this
17   corporate account is further discussed when she and Richard Ayvazyan
18   are dealing with the freezing and closure of numerous accounts and
19   their attempts to open new ones.  (See e.g., GEX 10 at 33-35.)
20   Defendant discusses her success in opening a new account, further
21   discussing her use of a stock purchase agreement to obtain control
22   since the account was opened in her own name but "the Corp online
23   everything belongs to Alak".  (GEX 10 at 34-35 (text messages 4699-
24   4716).)
25   These are only two examples of names used to create numerous new
26   means of identification or possess fraudulently created means of
27   identification, which themselves would exceed the five or more
28   threshold established in the Guidelines.  Other examples include, but

are not limited to, means of identification in the names of Anton
Kudiumov, Viktoria Kauichko, and many others.  The government
therefore respectfully recommends that the two-level enhancement be
applied to defendant's offense level in accordance with U.S.S.G.
§ 2B1.1(b)(11)(C)(i) and (ii).

**The PSR Should Apply a Two-Level Victim-related Adjustment**

The government further recommends that defendant's offense level
be increased by two because she "knew or should have known that a
victim of the offense was a vulnerable victim."  U.S.S.G.
§ 3A1.1(b)(1).  As discussed above, the evidence found at defendant's
Weddington residence and her own text messages and phone show that
she deliberately targeted individuals who were vulnerable to their
information being exploited for use in the fraud, including foreign
exchange students who had left the United States years before COVID-
19 and were therefore unable to protect their identities from
exploitation, as well as the deceased.

This enhancement applies to individuals that are "unusually
vulnerable due to age, physical or mental condition, or who is
otherwise particularly susceptible to the criminal conduct."
U.S.S.G. § 3A1.1(b)(1) App. Note 2.  The purpose of the adjustment is
to punish and deter criminals like defendant from victimizing those
who cannot protect themselves:

> The "vulnerable victim" sentencing enhancement is intended
> to reflect the fact that some potential crime victims have
> a lower than average ability to protect themselves from the
> criminal.  Because criminals incur reduced risks and costs
> in victimizing such people, a higher than average
> punishment is necessary to deter the crimes against them. .
> . . Defrauders who direct their activities not against
> banks, insurance companies, or large investors, but instead
> against people [with] . . . mental or educational
> deficiencies, . . . do not need to take as many precautions
> against the discovery of their scheme by the intended

11

victims and in any event are less likely to be prosecuted, because the victims are less likely to know that they have been defrauded or if they know to have the know-how and initiative required to press a criminal complaint or bring a civil suit.

United States v. Etoty, 679 F.3d 292, 296 (2012) (quoting United States v. Grimes, 173 F.3d 634, 637 (7th Cir.1999)).

The number of J-1 visa-related documents found at the Weddington residence shows that defendant and her co-conspirators deliberately targeted foreign visitors who, once they left the United States, would have little to no capacity to identify and protect their name from use in a U.S. government supported disaster relief loan program. This alone would be sufficient to qualify for the enhancement. However, in addition to targeting such victims, defendant and her coconspirators deliberately used the names of deceased individuals who were no longer capable of protecting the fraudulent use of their identity. See United States v. Cuellar, 165 F.3d 918 (9th Cir. 1998) (applying "vulnerable victim" enhancement where defendant used the identity of a deceased individual to fraudulently obtain a credit card in the deceased's name). This is exemplified by defendant's response to Richard Ayvazyan's text that she could submit two applications using a victim's name, in which defendant writes, "Let's go the fool is dead on armo land." (GEX 10 at 9 (text messages 2961-2973); see also GEX 10 at 40 (defendant and R. Ayvazyan text about sending emails in the name of Olaf Landsgaard, a deceased attorney).)

In addition to taking advantage of foreign students and visitors and the deceased, defendant and her co-conspirators exploited victims they knew were elderly. This includes, for example, an elderly couple whose bank account defendant and Richard Ayvazyan used to

1  receive fraudulent EIDL proceeds.  As described in text messages and

2  their attachments, S.G. was the recipient of Social Security

3  Disability payments on behalf of her spouse, who suffered from

4  Alzheimer's.[5]  (See GEX 10 at 32 (text messages 4471-4521), GEX 10-

5  46, GEX 10-47.)  Although defendant and Richard Ayvazyan initially

6  took steps to try and resolve the situation, the response from

7  defendant and Richard Ayvazyan was distinctly less supportive when

8  the conversation turned to the account holder's fear and desire to

9  return the money.  (See GEX 10 at 32 (text messages 4520-4521 (text

10 from defendant stating, "But this fools scared of everything u know"

11 with response from Richard Ayvazyan, "Ya babe that's why they bring

12 it on to themselves.  Like if you can't handle the heat get out of

13 the fucken kitchen"), GEX 10 at 33 (text messages 4601-4604) (Richard

14 Ayvazyan responding to defendant's comments regarding the account

15 with, "I know but the idiot wants to send the money back" with

16 further expletives), and GEX 10-48.)

17        **Corrections and Clarifications**

18        In addition to the above, the government submits this response

19 to correct or clarify the following:

20        • In paragraph 5, the description of Count 24 should be

21           amended to state that, "co-defendant Arthur Ayvazyan and T.

22           Dadyan, each aiding and abetting the other, <u>knowingly</u>

23           <u>transferred, possessed, and used, and willfully caused to</u>

24           <u>be transferred, possessed, and used</u>, without lawful

25

26        [5] The definition for "victim" in a case that involves means of
   identification includes "any individual whose means of identification
27 was used unlawfully or without authority."  U.S.S.G. § 2B1.1, App.
   Note 4(E)(ii).  Given defendant and her co-conspirators use of S.G.'s
28 means of identification was unlawful (the receipt of fraudulent loan
   proceeds), S.G. qualifies as a victim in this case.

                                    13

authority means of identification . . ." (underline added
to emphasize revision).

- In footnote 2 appended to paragraph 34, the last sentence
should be revised to read, "On May 12, 2020, T. Dadyan
texted R. Ayvazyan that they 'need to do the max' now as
the market was going to crash" (underline added to
emphasize revision).

- In paragraph 15 under the section titled "Pretrial
Adjustment," the description of defendant's terms of
pretrial release should be revised to reflect that $100,000
of her $200,000 bond is secured by property posted by a
third-party surety.  (See ECF 113, 115.)

- Paragraphs 16, 17, 18 and 23 under the section titled "Co-
Defendants" should be corrected to state that co-defendants
Richard Ayvazyan, Marietta Terabelian, Artur Ayvazyan, and
Vahe Dadyan were found guilty by jury trial on June 25,
2021, not June 28.

- The first sentence of paragraph 37 under the section titled
"T. Dadyan's Conduct" should be revised to state that "T.
Dadyan submitted, caused to be submitted, and aided and
abetted . . .," with the new proposed language underlined
above.

- The first sentence of paragraph 39 under the section titled
"T. Dadyan's Conduct" should be revised to state that ". .
. others submitted and caused to be submitted to Wells
Fargo bank . . ., with the new proposed language underlined
above.

- In paragraph 41 under the section titled "T. Dadyan's Conduct," the references to "A. Ayvazyan" should be corrected to refer to "R. Ayvazyan."  In addition, in the last sentence of the paragraph, it appears the phrase "caused to be wired" is missing after the words "then wired and".

- The third sentence of paragraph 42 under the section titled "T. Dadyan's Conduct" should be revised to state that "T. Dadyan and her co-conspirators also submitted and caused the submission of fake IRS Forms . . .," with the new proposed language underlined above.

- The second to last sentence of paragraph 58 under the section titled "Count Group 1: Money Laundering Conspiracy" should be revised to state "T. Dadyan and her co-conspirators also used fictitious identification documents for the business . . .," with the new proposed language underlined above.

Dated: September 27, 2021          Respectfully submitted,

                                  TRACY L. WILKISON
                                  Acting United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division

                                        /s/
                                  _____
                                  CATHERINE AHN
                                  SCOTT PAETTY
                                  BRIAN FAERSTEIN
                                  Assistant United States Attorneys
                                  CHRISTOPHER FENTON
                                  Department of Justice Trial Attorney

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA