TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
CATHERINE AHN (Cal. Bar No. 248286)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
     1100/1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527/2424/3819
     Facsimile: (213) 894-6269/0141
     E-mail:    Scott.Paetty@usdoj.gov
                Catherine.S.Ahn@usdoj.gov
                Brian.Faerstein@usdoj.gov

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
     1400 New York Avenue NW, 3rd Floor
     Washington, DC 20530
     Telephone: (202) 320-0539
     Facsimile: (202) 514-0152
     E-mail:   Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:20-cr-579(A)-SVW |
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT TAMARA DADYAN'S MOTION TO WITHDRAW GUILTY PLEA |
| v. | |
| RICHARD AYVAZYAN,<br>  aka "Richard Avazian" and<br>      "Iuliia Zhadko,"<br>MARIETTA TERABELIAN,<br>  aka "Marietta Abelian" and | Hearing Date: November 8, 2021<br>Hearing Time: 11:00 a.m.<br>Location: Courtroom of the Hon. Stephen V. Wilson |

"Viktoria Kauichko,"
ARTUR AYVAZYAN,
   aka "Arthur Ayvazyan," and
TAMARA DADYAN,
MANUK GRIGORYAN,
   aka "Mike Grigoryan," and
      "Anton Kudiumov,"
ARMAN HAYRAPETYAN,
EDVARD PARONYAN,
   aka "Edvard Paronian" and
      "Edward Paronyan," and
VAHE DADYAN,

        Defendant.

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California, Assistant United States Attorneys Scott Paetty, Catherine Ahn, and Brian Faerstein, and Department of Justice Trial Attorney Christopher Fenton, hereby files its Response to Defendant Tamara Dadyan's Motion to Withdraw Guilty Plea (ECF 998).

//

//

//

//

//

//

//

//

//

//

This response is based upon the attached memorandum of points and authorities, the declaration of Christopher Fenton and accompanying exhibits, Fred Minassian's responses to the government's interrogatories which are filed hereto under seal pursuant to the Court's order entered October 8, 2021 (ECF 1048), the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 28, 2021          Respectfully submitted,

                                 TRACY L. WILKISON
                                 Acting United States Attorney

                                 SCOTT M. GARRINGER
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 _____/s/_____
                                 CATHERINE AHN
                                 SCOTT PAETTY
                                 BRIAN FAERSTEIN
                                 Assistant United States Attorneys
                                 CHRISTOPHER FENTON
                                 Department of Justice Trial Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**<u>TABLE OF CONTENTS</u>**

**Contents**

TABLE OF CONTENTS......................................................i

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.   Introduction...................................................1

II.  Statement of Facts.............................................2

     A.   The Overwhelming Evidence of Defendant's Guilt............2

     B.   The Court's Orders Denying Defendant's Motions to
          Suppress.................................................6

     C.   The Plea Agreement.......................................8

     D.   The Change of Plea Hearing..............................12

     E.   Defendant's Motion to Withdraw Her Guilty Plea..........15

III. Argument......................................................17

     A.   Defendant Fails to Meet Her Burden of Demonstrating a
          Fair and Just Reason to Withdraw Her Guilty Pleas.......18

IV.  Conclusion....................................................25

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

Muth v. Fondren, 676 F.3d 815 (9th Cir. 2012)......................19

4

United States v. DeSimone, 736 F. Supp. 2d 477 (D.R.I. 2015)...23, 24

5

United States v. Ensminger, 567 F.3d 587 (9th Cir. 2009)...........17

6

United States v. Garcia, 401 F.3d 1008 (9th Cir. 2005).............18

7

United States v. Hyde, 520 U.S. 670 (1997).........................17

8

United States v. Jones, 472 F.3d 1136 (9th Cir. 2007)..............17

9

United States v. Joslin, 434 F.2d 526 (D.C. Cir. 1970).............18

10

United States v. McTiernan, 546 F.3d 1160 (9th Cir. 2008).........18

11

United States v. Miller, 953 F.3d 1095 (9th Cir. 2020)............22

12

United States v. Nostratis, 321 F.3d 1206 (9th Cir. 2003).........25

13

United States v. Ortega-Ascanio, 376 F.3d 879 (9th Cir. 2004)......18

14

United States v. Rios-Ortiz, 830 F.2d 1067 (9th Cir. 1987)........17

15

United States v. Ross, 511 F.3d 1233 (9th Cir. 2008)...............19

16

United States v. Treadwell, 593 F.3d 990 (9th Cir. 2010)..........22

17

United States v. Wells, 804 F. App'x 515 (9th Cir. 2020)..........22

18

**OTHER AUTHORITIES**

19

Fed. R. Crim. P. 11.......................................17, 20, 24

20

U.S.S.G. § 1B1.3(a)(1)(B).......................................22, 23

21

U.S.S.G. § 2B1.1(b)(1)(K)..........................................22

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    Introduction

The evidence of defendant Tamara Dadyan's ("defendant") guilt is overwhelming.  It is the same evidence the government offered at the trial of her co-defendants and led to their conviction on every count with which she is also charged.  There is no serious question that had she proceeded to trial, she too would have been found guilty on all counts.  It is also highly likely that she would have been found guilty for an attempted bank fraud scheme she committed while on release awaiting trial.  This charge, which is unique to her and carries with it a significant risk of a substantial sentence of imprisonment consecutive to any other term, is supported by audio recordings of telephone calls she made from her personal telephone. The government, however, agreed to dismiss the attempted bank fraud count as part of a plea agreement pursuant to which defendant Tamara Dadyan pleaded guilty to conspiracy and aggravated identity theft counts.

Despite signing the plea agreement and thrice admitting to the factual basis (once while under oath), on the eve of sentencing defendant Tamara Dadyan now moves to withdraw her plea.  She does not challenge the adequacy of the Rule 11 plea colloquy or identify newly-discovered evidence or intervening circumstances that could meet her burden to demonstrate a fair and just reason to permit withdrawal.  Instead, she attempts to manufacture an ineffective assistance of counsel claim based on an issue she purports to have with respect to a single sentence in the factual basis.  Her claim is contradicted by the record, and, even if credited, would not change that she has admitted all of the elements of the offenses and that

1  the Guidelines to which her admissions have exposed her would not

2  change.  She has not, therefore, established a fair and just reason

3  to withdraw her plea.  The Court should deny her motion and proceed

4  to sentence her along with her co-defendants on November 15, 2021.

5  **II.  Statement of Facts**

6      **A.    The Overwhelming Evidence of Defendant's Guilt**

7      Although defendant Tamara Dadyan claims that the statement in

8  the factual basis for her plea linking her to all 151 fraudulent loan

9  applications at issue in this case was untrue, the evidence – all of

10 which was provided to her in discovery – clearly showed otherwise and

11 established her knowing participation in the overall conspiracy.  On

12 November 5, 2020, federal law enforcement agents arrested defendant

13 Tamara Dadyan and her husband, defendant Artur Ayvazyan, and searched

14 their home on Weddington Street pursuant to a valid warrant.  (ECF 20

15 and 5 (Initial Appearance of Tamara Dadyan and Artur Ayvazyan,

16 respectively) and ECF 297 (Order Denying Motion to Suppress as to

17 Artur Ayvazyan and Tamara Dadyan).)  The search yielded overwhelming

18 evidence of their involvement in a conspiracy to fraudulently obtain

19 COVID-19 disaster relief funds and launder the proceeds.[1]

20     Specifically, the government seized voluminous records,

21 including handwritten notes, checks, and copies of identification

22

23 _____

24     [1] A detailed discussion of some of the items seized from the
    Weddington residence, as well as some of the text messages seized
25  from defendant Tamara Dadyan and Artur Ayvazyan's phones, can be
    found in ECF 387 (Government's Motion in Limine to Admit Evidence
26  Inextricably Intertwined with the Charged Offenses), 441 (Reply in
    Support), and 793 (Government's Opposition to Defendant Artur
27  Ayvazyan's Rule 29 and 33 Motions) (denied in ECF 875 (rejecting
    defendant's argument and noting that "there was overwhelming evidence
28  of [defendant Artur Ayvazyan's] guilt and that "[t]he evidence in
    this case does not preponderate heavily against the verdict.
    Instead, it preponderates heavily in favor . . .").).

documents and immigration records bearing the names and pictures of individuals other than defendant Tamara Dadyan and her husband, as well as their phones.  Defendant Tamara Dadyan's phone contained voluminous text messages between herself and defendant Richard Ayvazyan detailing the inner workings of the conspiracy, including texts and attachments specific to many of the synthetic identities that were central to the crimes charged (including Iuliia Zhadko, Viktoria Kauichko, Anton Kudiumov, and Liudmyla Kopytova). (Government Trial Exhibit ("GEX") 10 at 1–70.)  Among other things, these texts discussed how to submit fraudulent PPP and EIDL applications; how to obtain and falsify Employer Identification Numbers ("EINs") for businesses in PPP and EIDL applications; and how to create fake payroll reports.  (Id.)

In her text messages to defendant Richard Ayvazyan, defendant Tamara Dadyan also repeatedly made statements inculpating herself. She even joked about the harmful impact her crimes had on the federal government and its disaster relief efforts, including about bankrupting the United States.  (GEX 10 at 4 ("They r never gonna have enough money America needs to file bk"); GEX 10 at 7-8 ("Yah man we need to do the max we can now u understand market Gonna crash[.] And we can use the same names[.]"); GEX 10 at 13 ("No they kept hanging up I will wake up early call[.] I was like on hold for ever bro[.] Kept calling back today was disaster[.] Just like the loan they r giving lol[.]").)

Defendant Tamara Dadyan's phone also contained a substantial amount of other evidence of her extensive role in the loan fraud, including:

- digital photographs of California driver's licenses in the names of Iuliia Zhadko, Armen Inijian, Anna Dzukaeva, Alak Mikaelian, Diana Saakyan, and Leoncio Galver, all of which were names used to obtain fraudulent PPP and EIDL loans (GEX 13.b);

- an email from an email account associated with defendant Richard Ayvazyan detailing Iuliia Zhadko's purported personal information, addresses, and employment history (including at Mod Interiors Inc., which was used to fraudulently obtain PPP and EIDL loans) (GEX 13.b);

- checks in the names of Anna Dzukaeva, Diana Saakyan, Montadrath, and Am & Am Financial Services, all of which were identities and business names used to obtain fraudulent PPP and EIDL loans (GEX 13.c);

- screenshots and digital photographs showing evidence of fraudulent EIDL applications submitted through the U.S. Small Business Administration ("SBA") website on behalf of Artur Ayvazyan, Tamara Dadyan, Anna Dzukaeva, Roza Avakian, Alak Mikaelian, Liudmyla Kopytova, Mykhail Diuzhenko, Ara Haritunian, and Hagop Bartoumian, all of which were names used to submit fraudulent loan applications as part of the scheme (GEX 13.d);

- fraudulent tax forms purportedly prepared by Alexander Fard, a tax preparer whose name was stolen and repeatedly used in connection with the conspiracy (GEX 13.e);

- mail addressed to Viktoria Kauichko, Medet Murat, and Runyan Tax Service Inc., which were names used to obtain fraudulent PPP and EIDL loans (GEX 13.f);

- web history reports showing efforts to find information about anonymous VPN service with private internet access that would have the effect of concealing a user's identity and location (GEX 13.h); and

- email correspondence between CV Escrow and "Anton" relating to the purchase of the Imperial Court Residence, which was purportedly purchased by the synthetic identity Anton Kudiumov using stolen COVID-19 disaster relief funds (GEX 13.i).

The phone belonging to defendant Tamara Dadyan's husband, defendant Artur Ayvazyan, contained more evidence of their role in

4

the conspiracy, including, among other things, templates for creating fake identification documents (GEX 24.a), digital photographs of dozens of fake California driver's licenses and Social Security cards (including many of the same names used to obtain fraudulent PPP and EIDL loans described above) (GEX 26.b), screenshots and digital photographs showing evidence of fraudulent EIDL applications submitted through the SBA website (GEX 24.d), and digital photographs of bank records and banking information using the names of several individuals and companies who submitted fraudulent PPP and EIDL loan applications (GEX 24.e).

The government also seized voluminous physical evidence from defendant Tamara Dadyan and Artur Ayvazyan's home on Weddington Street, including, among other things, dozens of fake California driver's licenses, Social Security cards, and credit cards, including for individuals whose names were used to fraudulently apply for PPP and EIDL loans (GEX 57.a); dozens of fraudulent COVID-19 disaster relief loan applications (GEX 57.e); and blank checks and other records for dozens of bank accounts that received stolen COVID-19 disaster relief money (GEX 57.g).[2]

The digital and physical evidence seized from defendant Tamara Dadyan's phone and home comprised a significant part of the government's case-in-chief at trial against her co-defendants Artur Ayvazyan, Richard Ayvazyan, Marietta Terabelian, and Vahe Dadyan. This evidence was in addition to all of the other evidence admitted

---

[2] At defendants Tamara Dadyan and Artur Ayvazyan's home, agents also found official looking rubber stamps, including stamps for the Clerk of the United States Bankruptcy Court for the Central District of California, Los Angeles Registrar-Recorder/County Clerk, the Los Angeles Superior Court, and numerous notaries.  (ECF 207-1, ¶ 13, Ex. 13.)

1    at trial, including evidence seized from phones belonging to Artur

2    Ayvazyan, Richard Ayvazyan, Marietta Terabelian (GEX 16a-b, 19a-e,

3    24a-e), summary chart exhibits detailing the flow of stolen PPP and

4    EIDL loan money, including through bank accounts controlled by

5    defendants Tamara Dadyan and Artur Ayvazyan (GEX 115), and summary

6    chart exhibits showing how defendants Tamara Dadyan and Richard

7    Ayvazyan had together created an assembly line of fraud by creating

8    and using fake documents in support of dozens of fraudulent loan

9    applications (GEX 116).

10        **B.   The Court's Orders Denying Defendant's Motions to Suppress**

11        On March 15, 2021, defendants Tamara Dadyan and Artur Ayvazyan

12   jointly moved to suppress the evidence seized during the search of

13   their home, including the digital evidence on their phones and the

14   physical evidence described above.  (ECF 149.)  By that date,

15   defendants and their counsel had had ample time to review the

16   evidence seized from their home.  The physical evidence seized from

17   defendants Tamara Dadyan and Artur Ayvazyan's home was made available

18   for inspection beginning December 17, 2020.  (ECF 278-2.)  A complete

19   forensic copy of defendants Tamara Dadyan's and Artur Ayvazyan's

20   respective phones was also produced to them on February 1, 2021

21   (months before the prosecution team had the opportunity to review

22   this evidence due to privilege review).  (ECF 391-7, ECF 478 at 7.)

23        On April 27, 2021, the Court entered an order denying defendants

24   Tamara Dadyan and Artur Ayvazyan's joint motion to suppress in all

25   material respects.  (ECF 297.)  The Court found the search warrant

26   for their home was valid and amply supported by probable cause.

27   (Id.)  In addition to evidence they had applied for multiple

28   fraudulent loans using their home address, the Court detailed other

6

evidence relating to the loan fraud that agents found when they had searched trash left curbside outside defendants' home.  (Id. at 4-5 (citing Affidavit, In the Matter of the Search of [REDACTED] Weddington Street Encino California 91316, No. 2:20-MJ-05286).)[3]

On May 24, 2021, defendants Tamara Dadyan and Artur Ayvazyan jointly moved a second time to suppress the evidence on the phones seized during the search of their home.[4]  (ECF 363.)

On June 10, 2021, the Court entered an order denying their second motion, thereby allowing the government to offer evidence at trial of, among other things, defendant Tamara Dadyan's voluminous inculpatory text messages with defendant Richard Ayvazyan about numerous aspects of the fraudulent scheme.  (ECF 478.)

Approximately two hours after the Court's entry of its order, Fred Minassian, counsel for defendant Tamara Dadyan, emailed counsel for the government requesting a call to discuss the specific terms of a potential plea offer.  (Declaration of Christopher Fenton ("Fenton Decl.") ¶¶ 1-2, Ex. 1 (June 10, 2021 email chain between F. Minassian and government counsel), Ex. 2 (June 10, 2021 ECF notice of entry of Court order).)  Mr. Minassian had first contacted the government about the possibility of a potential plea agreement on behalf of defendant Tamara Dadyan in April 2021, and those discussions continued intermittently into early June 2021.  (See Fenton Decl. ¶ 3; see also Fred Minassian's Responses to Government's Interrogatories (filed separately under seal) at Response to

---

[3] Defendants Richard Ayvazyan and Marietta Terabelian made a similar motion to suppress the evidence seized from their home, including their phones (ECF 146), which the Court also denied (ECF 296).

[4] Defendants Richard Ayvazyan and Marietta Terabelian also joined in this motion.

1  Interrogatory Nos. 15 and 16.[5])  Following the denial of defendant

2  Tamara Dadyan's second motion to suppress, Mr. Minassian recommended

3  those discussions in greater detail, and, over the course of the next

4  several days, the parties discussed the specific terms of a potential

5  plea.  (Response to Interrogatory Nos. 16 and 17.)  On June 14, 2021,

6  defendant Tamara Dadyan agreed to and signed a plea agreement.  (ECF

7  525.)

8      **C.   The Plea Agreement**

9      Pursuant to the plea agreement that defendant Tamara Dadyan

10  reviewed with her counsel and signed, she agreed to plead guilty to

11  one count of conspiracy to commit wire fraud and bank fraud (Count

12  1), one count of conspiracy to commit money laundering (Count 26),

13  and one count of aggravated identity theft (Count 24).  (ECF 525 ¶¶

14  2.a, 5-9.)  The plea agreement described in clear terms the mandatory

15  minimum and statutory maximum sentences for each offense to which she

16  was pleading guilty.  (Id. ¶¶ 11-13).  It also described in clear and

17  unambiguous terms the total maximum sentence for all of the offenses

18  to which she was pleading guilty, including the total maximum term of

19  imprisonment which is 52 years' imprisonment.  (Id. ¶ 14.)  The

20

21  _____

22      [5]  As previously disclosed to the Court and defendant Tamara
Dadyan, counsel Minassian is charged in United States v. Matosyan et

23  al., No. CR 17-480(A)-PSG.  (ECF 95 at 2.)  Counsel Minassian has
pleaded not guilty to the charges and trial is currently scheduled

24  for February 15, 2022 before the Honorable Philip S. Gutierrez, Chief
District Judge.  (See Matosyan, ECF 645.)  He remains an active

25  member of the State Bar of California and the Bar of the Central
District of California.  On January 12, 2021, the Court held a

26  conference and found that defendant Tamara Dadyan was knowing and
aware of the potential conflict pertaining to her attorney, and the

27  Court further noted for the record that she voluntarily waived the
conflict.  (ECF 110.)  In an abundance of caution, however, the

28  government only cites to counsel Minassian's Responses to the
Government's Interrogatories where his statements are supported or
corroborated by other information.

parties agreed to a Sentencing Guidelines calculation totaling 31 (before acceptance of responsibility).  (Id. ¶ 21.)  The parties reserved their rights to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.  (Id.)

The factual basis, which is nearly seven pages long, is extremely detailed.  (Id. ¶ 19.)  It specifically identified many of defendant Tamara Dadyan's co-conspirators by name and described the scope of the relevant conduct relating to the conspiracy counts to include at least 151 fraudulent applications; explained the types of false and fraudulent information used to obtain PPP and EIDL loans; and listed several of the key synthetic or stolen identities used in the fraud including Iuliia Zhadko, Viktoria Kauichko, and Anna Dzukaeva.  (Id.)

The factual basis also detailed the sources and significance of the evidence found in defendant Tamara Dadyan's home.  For example:

- "Defendant further conspired and agreed with her husband, Artur Ayvazyan, to create false and fraudulent documentation in support of loans, including through the use of templates for creating false and fraudulent documents that were found on Artur Ayvazyan's phone."

- "Defendant further admits that records and items found at her residence, at which she lived with co-defendant Artur Ayvazyan, included: fake identification documents; fraudulently obtained credit cards belonging to fake, synthetic and stolen identities including names used to apply for PPP and EIDL loans; checks and checkbooks in the names of individuals and businesses who applied for PPP and EIDL loans; copies of PPP and EIDL loan applications including in her own name and the names of others; and fake and stolen notary stamps and seals belonging to state and federal courts."

- "[T]ext messages obtained from defendant's phone showed that defendant explicitly discussed plans for the

> conspiracy with co-defendant Richard Ayvazyan, including
> how to submit PPP and EIDL applications; how to obtain and
> falsify Employer Identification Numbers ("EINs") for
> businesses in PPP and EIDL applications; and how to create
> fake payroll reports."

(Id.)

Defendant Tamara Dadyan certified that, among other things, she had reviewed the plea agreement, discussed all of the terms with her then-counsel Fred Minassian, and voluntarily agreed to the terms:

> I have read this agreement in its entirety.  I have had enough
> time to review and consider this agreement, and I have carefully
> and thoroughly discussed every part of it with my attorney.  I
> understand the terms of this agreement, and I voluntarily agree
> to those terms.  I have discussed the evidence with my attorney,
> and my attorney has advised me of my rights, of possible
> pretrial motions that might be filed, of possible defenses that
> might be asserted either prior to or at trial, of the sentencing
> factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing
> Guidelines provisions, and of the consequences of entering into
> this agreement.  No promises, inducements, or representations of
> any kind have been made to me other than those contained in this
> agreement.  No one has threatened or forced me in any way to
> enter into this agreement.  I am satisfied with the
> representation of my attorney in this matter, and I am pleading
> guilty because I am guilty of the charges and wish to take
> advantage of the promises set forth in this agreement, and not
> for any other reason.

(Id. at 29-30.)  Mr. Minassian certified that he had reviewed and discussed with defendant Tamara Dadyan the terms and consequences of the plea agreement.[6]  (Id. at 30-31.)

The benefits of the plea agreement to defendant Tamara Dadyan were significant.  In addition to a two-point reduction for acceptance of responsibility, the plea agreement provided for the

---

[6] Many of the statements that are the subject of Mr. Minassian's signed certification are corroborated by his responses to the government's interrogatories and the change of plea hearing.  (See, e.g., Response to Interrogatory Nos. 3, 8, 9, 16, 18, 19; June 14, 2021 Hr'g Tr. at 4:24-7:3.)

dismissal of Count 33, which was an attempted bank fraud scheme defendant Tamara Dadyan perpetrated while on pre-trial release.[7]  The evidence supporting that scheme included audio recordings of calls she had placed using her personal telephone number to an FDIC-insured financial institution while posing as Anna Dzukaeva to fraudulently obtain access to stolen COVID-19 disaster relief funds she laundered through an account she had opened under false pretenses.  (Fenton Decl. ¶ 4, Ex. 3.)  This crime allegedly took place after she had been initially indicted and was on release awaiting trial in this case.  Had she been convicted of Count 33 at trial, her offense level would have increased from at least 31 to at least 34, plus an additional two points to at least 36 in the absence of her acceptance of responsibility offense level reduction, increasing the advisory Guidelines range by at least 80 to 100 months' imprisonment.[8]  Such a conviction would also constitute a violation of 18 U.S.C. § 3147, resulting in an additional potential term of imprisonment of up to ten years, to be served <u>consecutive</u> to any other custodial term. Defendant Tamara Dadyan was informed of the sentencing considerations relating to Count 33 and the benefit that would result from its

---

[7] As part of the plea agreement, the government also agreed to dismiss the substantive wire fraud and bank fraud counts; however, dismissal of those particular counts did not impact the calculation of the offense level under the Guidelines.

[8] The government has filed a response to defendant Tamara Dadyan's Presentence Report arguing that her offense level should be increased by seven to a total offense level of 38 based on her aggravating role (3 levels), her possession of five or more means of identification (2 levels), and the vulnerable victim enhancement (2 levels).  These enhancements would apply regardless of whether defendant pleaded guilty or was convicted at trial.  (ECF 1001 at 2-13.)  If applied post-conviction at trial on all counts, defendant's offense level would have increased to 43 and her advisory guidelines range would have increased from 188 to 235 months to life imprisonment.

1   dismissal.  (Fenton Decl. ¶ 5, Ex. 4 ("June 14, 2021 Hr'g Tr.") at

2   14:9-16; Response to Interrogatory Nos. 8, 9, 15, 18.)

3       **D.   The Change of Plea Hearing**

4       On June 14, 2021, the Court held a change of plea hearing during

5   which defendant Tamara Dadyan was sworn and the Court asked her a

6   series of probing questions to assure the Court that her guilty pleas

7   were voluntary and knowing.  (See generally June 14, 2021 Hr'g Tr.)

8       The Court asked whether defendant Tamara Dadyan had enough time

9   to discuss her case and all possible defenses with Mr. Minassian and

10  whether she was satisfied with his representation.  (Id. at 4:9-14.)

11  She responded in the affirmative to both questions.  (Id.)  The Court

12  then questioned Mr. Minassian, who confirmed he had indeed met with

13  her on several occasions.  (Id. at 4:24-5:2.)  Mr. Minassian further

14  confirmed he had "thoroughly" reviewed discovery.  (Id. at 30:5-7.)

15      The Court asked whether defendant Tamara Dadyan had read,

16  understood, and discussed fully the plea agreement with Mr.

17  Minassian.  (Id. at 5:10-17.)  She responded in the affirmative to

18  all three questions.  (Id.)  The Court then questioned Mr. Minassian,

19  who stated he had reviewed the plea agreement "extensively" with

20  defendant and confirmed he was satisfied from his discussions with

21  his client that she fully understood all of the terms and conditions

22  in the plea agreement.  (Id. at 5:18-7:3.)

23      At the direction of the Court, counsel for the government orally

24  reviewed certain aspects of the plea agreement in the presence of

25  defendant Tamara Dadyan.  Specifically, counsel for the government:

26      • described the applicable mandatory minimum and statutory

27        maximum sentences for each offense to which she was
          pleading guilty;

28

                                    12

- disclosed the total maximum sentence for all of the offenses to which she was pleading guilty, including the total maximum term of imprisonment which is 52 years' imprisonment;

- set forth the parties' agreement to certain applicable sentencing factors that include a base offense level of 31 (before acceptance of responsibility); and

- explained the government would dismiss certain counts against defendant at the time of sentencing, including Count 33 which would have resulted in a plus-three offense level enhancement, and recommend a minus two-level reduction in the Guidelines offense level calculation at sentencing provided defendant demonstrates acceptance of responsibility.

(Id. at 8:1-14:16.)  Counsel for the government also read aloud the factual basis from the plea agreement, including the specific provisions discussed and quoted above.  (Id. at 15:1-23:6.)

At the conclusion of the reading of the factual basis, the Court asked a series of specific questions of defendant Tamara Dadyan to ensure she had actually committed the crimes for which she was pleading guilty.  Under oath, she admitted in Court to specific details supporting her pleas of guilty to the conspiracy counts, including the names of her co-conspirators; that she met with her co-conspirators on several occasions to plan the crimes; that she knowingly and voluntarily implicated her husband in crime; that "Viktoria Kauichko" was a fake name used by defendant Richard Ayvazyan; and that she set up a bank account using the name Anna Dzukaeva which she controlled along with certain of her co-conspirators.  (Id. at 23:10-26:18.)

The Court also focused on a specific set of facts, namely that defendant Tamara Dadyan had "submitted and caused to be submitted and aided and abetted the submission of at least 151 fraudulent PPP and

EIDL applications as part of the conspiracy and scheme in which she was a participant along with Richard Ayvazyan, Marietta Terabelian, Artur Ayvazyan, Vahe Dadyan, and others." (Id. at 17:4-9.) The Court inquired about the purpose behind the inclusion of this language and, after hearing the explanation from counsel for the government and defense counsel's concurrence, expressed its understanding. Importantly, Mr. Minassian expressly stated that he had discussed the purpose of including this language with defendant Tamara Dadyan, who was present and standing next to Mr. Minassian, and she did not state otherwise:

> THE COURT: There is a section here following the part I just read same page 20, it says you caused the submission of a 151 loan applications and attempted to receive 21 million and received 18. I mean, that is in the plea agreement. But did you know that at the time? Were you familiar with every loan application in this case?
>
> THE DEFENDANT: Not all of it, but –
>
> THE COURT: So I mean why did the government put that in there?
>
> THE GOVERNMENT: Your Honor, it's the position of the government that given Ms. Dadyan's role in the conspiracy, it was reasonably foreseeable to her that the scheme in the conspiracy would cause the submission of --
>
> THE COURT: That may very well be, but this is the factual basis of the guilty plea. It seems that unless I'm misunderstanding, that she wasn't tabulating and counting the applications. She said she didn't know about all of them. She's admitted that she knew about the other ones that are in the plea agreement. Why was it necessary to put that in the plea agreement?
>
> THE GOVERNMENT: That was for the basis of relevant conduct and the loss, Your Honor.
>
> THE COURT: So by agreeing to that, your position is that at the time of sentencing then that becomes relevant conduct?
>
> THE GOVERNMENT: Yes, Your Honor.

14

THE COURT: Do you agree, Mr. Minassian?

MR. MINASSIAN: Yes, Your Honor, I do. That's the reason how I explained it to my client.

THE COURT: I see.

(Id. at 26:19-27:23.)

Before concluding the change of plea hearing, the Court again sought to confirm that defendant Tamara Dadyan's guilty pleas were voluntary, knowing and intelligent:

THE COURT: You realize, Ms. Dadyan, this is a very significant day in your life. I'm just trying to make sure that you're doing this with your eyes wide open. That is my concern. Are you?

THE DEFENDANT: Yes, Your Honor.

(Id. at 29:21 – 30:1.)  The Court then made a finding that the guilty plea was freely and knowingly made, accepted the plea, and ordered preparation of a presentence investigation report.  (Id. at 30:8-13.)

On August 3, 2021, when being interviewed by the U.S. Probation and Pretrial Services Office, defendant Tamara Dadyan again reviewed and stipulated to the factual basis.  (ECF 959 ¶ 48.)

**E.    Defendant's Motion to Withdraw Her Guilty Plea**

Three weeks before her sentencing, after she had the opportunity to review and object to her Presentence Investigation Report (ECF 959), defendant Tamara Dadyan moved to continue her hearing date and withdraw her guilty plea.  (ECF 998, 1002.)  The motion to withdraw her guilty plea is based on her claim that her former attorney, Mr. Minassian, provided ineffective assistance in connection with her plea, thus rendering the plea non-voluntary, and that she was pressured to admit facts that were false, thus exposing her to a substantially higher Guidelines range.

15

Specifically, defendant Tamara Dadyan now claims that she only submitted four fraudulent applications and that she did not know about most of the remaining 151 fraudulent applications much less participate in them.[9]  (ECF 998 at 5-8.)  She further claims that she advised Mr. Minassian that she was not responsible for all 151 fraudulent loans, but that Mr. Minassian pressured her to nevertheless sign a plea agreement that contained a factual basis they both knew to be factually inaccurate.  (Id.)  She asserts that the purported intentional misstatement of facts relating to the 151 fraudulent loans became known to the government and the Court during the change of plea hearing, but that the Court nevertheless accepted the plea.[10]  (Id. at 6-7.)  According to the attorney presently representing defendant, her former attorney, Mr. Minassian, should have advised her to plead guilty without a plea agreement to only certain counts and proceed to trial on the rest, which is how she now wishes to proceed.  (Id. at 10.)  She claims that she would have originally proceeded in this manner, but that her former attorney,

---

[9] Defendant Tamara Dadyan's claim that she only submitted four fraudulent loan applications is obviously false and belied by the overwhelming evidence the government offered at her co-defendants' trial, including the evidence of dozens of fraudulent PPP and EIDL loan applications found on her and her husband's phones and in their home (all of which is described above).  Defendant's false claim of not knowing about any fraudulent loan applications other than the four to which she now admits call into question her acceptance of responsibility and may even constitute obstruction.

[10] Defendant Tamara Dadyan also states that it was "unfortunate that the United States insisted on the false factual basis in order to permit the defendant to plea."  (ECF 998 at 12.)  To the extent she alleges the government knowingly asked defendant to sign and plead guilty to a factual basis the government knew to be untrue, that allegation is false.  As discussed further herein, the overwhelming evidence in this case supports the factual basis to which the parties agreed as part of the plea agreement.

1   Mr. Minassian, incorrectly advised that she had to either plead

2   guilty to all of the counts or none of them.  (Id.)

3   **III. Argument**

4       A defendant may withdraw from a plea of guilty before sentencing

5   if "the defendant can show a fair and just reason for requesting the

6   withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  Although the standard is

7   applied liberally, "[t]he burden of demonstrating such a fair and

8   just reason rests with defendant."  United States v. Jones, 472 F.3d

9   1136, 1141 (9th Cir. 2007).

10      A mere change of heart about the decision to plead guilty is not

11  a fair and just reason.  United States v. Rios-Ortiz, 830 F.2d 1067,

12  1069 (9th Cir. 1987).  The fair and just reason standard thus does

13  not permit a defendant to withdraw her guilty plea "simply on a

14  lark," especially "[a]fter the defendant has sworn in open court that

15  [s]he actually committed the crimes, after [s]he has stated that

16  [s]he is pleading guilty because [s]he is guilty, after the court has

17  found a factual basis for the plea, and after the court has

18  explicitly announced that it accepts the plea."  United States v.

19  Hyde, 520 U.S. 670, 676 (1997).  A guilty plea is a "grave and solemn

20  act, which is accepted only with care and discernment" and is not "a

21  mere gesture, a temporary and meaningless formality reversible at the

22  defendant's whim."  Id. at 677 (citations omitted).  Indeed, as the

23  Ninth Circuit has rightly held, "[o]nce the plea is accepted,

24  permitting withdrawal is, as it ought to be, the exception, not an

25  automatic right."  United States v. Ensminger, 567 F.3d 587, 593 (9th

26  Cir. 2009) (emphasis added).

27      In the Ninth Circuit, "[f]air and just reasons for withdrawal

28  include inadequate Rule 11 plea colloquies, newly discovered

evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered h[er] plea." See United States v. Ortega-Ascanio, 376 F.3d 879, 883 (9th Cir. 2004).

"Erroneous or inadequate legal advice may also constitute a fair and just reason for plea withdrawal," United States v. McTiernan, 546 F.3d 1160, 1167 (9th Cir. 2008), but only when the proper legal advice of which the defendant was deprived "could have at least plausibly motivated a reasonable person in [the defendant's] position not to have pled guilty." United States v. Garcia, 401 F.3d 1008, 1011–12 (9th Cir. 2005).[11]

## A. Defendant Fails to Meet Her Burden of Demonstrating a Fair and Just Reason to Withdraw Her Guilty Pleas

Defendant fails to meet her burden of showing that she received erroneous or inadequate legal advice constituting a fair and just reason for withdrawal of her guilty pleas.

First, defendant does not actually dispute that she committed the crimes to which she pleaded guilty, namely (i) conspiring with co-defendants Richard Ayvazyan, Marietta Terabelian, Artur Ayvayzan,

---

[11] Defendant's purported articulation of the applicable standard is wrong as a matter of law. (ECF 998 at 8–9.) Defendant cites a composite of non-binding out-of-circuit cases mixing the different standards that would apply to a motion to withdraw a guilty plea pre- and post-sentencing. Defendant also cites and quotes legal principles that have no application here. For example, she includes the following quote from the D.C. Circuit's opinion in United States v. Joslin, 434 F.2d 526, 531 (D.C. Cir. 1970): "If the request was made because appellant thought he had a defense, permission to withdraw 'should be rather freely granted.'" Defendant, however, did not make the request to withdraw her guilty plea based on a newly discovered defense. Rather, her request is based on a false claim that her former counsel purportedly asked her to sign a factual basis they both allegedly knew was inaccurate.

Vahe Dadyan, and other co-conspirators to fraudulently obtain PPP and EIDL loans and launder the proceeds, and (ii) aggravated identity theft based on her unauthorized use of Anna Dzukaeva's name. Moreover, the evidence in the record, which includes defendant's prior statements made during her signed plea agreement and Rule 11 plea colloquy and interview with Probation, satisfy the elements of the crimes to which she pleaded guilty and thus support her guilty plea. (ECF 525 ¶ 19; June 14, 2021 Hr'g Tr. at 15:1-23:6; ECF 959 ¶ 48.) These prior statements are entitled to substantial weight and support a finding that her guilty plea was knowing and voluntary and valid. See, e.g., Muth v. Fondren, 676 F.3d 815, 821 (9th Cir. 2012) ("Petitioner's statements at the [Rule 11] plea colloquy carry a strong presumption of truth."); United States v. Ross, 511 F.3d 1233, 1236 (9th Cir. 2008) ("Statements made by a defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings attacking the plea."). In addition, these statements are corroborated by the overwhelming evidence found in defendant's phone and home, as well as the other evidence described above that was offered against the four co-defendants who went to trial and resulted in guilty verdicts on every count for which defendant Tamara Dadyan had been jointly charged with them. For this reason alone, the Court should deny defendant's motion.

Second, the sole statement that she now disputes relates only to the number of fraudulent loans submitted as part of the conspiracy. (ECF 998 at 6-7.). The number of fraudulent loans is not an element of either conspiracy count. (ECF 525 ¶¶ 5-6, 8-9.) Nor is it an element of the aggravated identity theft count. (Id. ¶ 7.) Contrary to defendant's claim, this statement is therefore not relevant to the

ultimate question of guilt for the crimes to which she pleaded guilty.  Moreover, the inclusion in the factual basis of the full number of loans submitted by the conspiracy in which defendant Tamara Dadyan played a central role was accurate and appropriate.

Third, Mr. Minassian did not provide ineffective assistance by allowing defendant to sign a plea agreement that included a reference to the number of fraudulent loan applications submitted as part of the conspiracy.  (ECF 525 at 16.)  As part of its thorough Rule 11 inquiry, the Court specifically inquired about the purpose of including this statement after defendant Tamara Dadyan said she had not personally submitted all of the fraudulent loan applications. (June 14, 2021 Hr'g Tr. at 26:19-27:23.)  In response, counsel for the government and Mr. Minassian both informed the Court that the purpose was to provide a basis for relevant conduct and loss, which was factually and legally correct.  (Id.)  Mr. Minassian further informed the Court, in her presence, that he had explained the purpose and significance of the statement to defendant Tamara Dadyan (who said nothing to the contrary).  (Id.)  The Court accepted counsel's position, completed its inquiry and accepted defendant's guilty plea.  (Id.)  Mr. Minassian's advice with respect to this issue was thus neither erroneous nor inadequate.

The fact of Mr. Minassian's explanation to defendant Tamara Dadyan regarding the inclusion of the 151 loans in the factual basis is further corroborated by Mr. Minassian's responses to the government's interrogatories, which state that he explained to defendant Tamara Dadyan that it was the government's position that the co-conspirators were responsible for all of the fraudulent loan applications submitted as part of the conspiracy.  (Response to

Interrogatory Nos. 6, 7, and 10.)  Indeed, Mr. Minassian specifically informed Defendant that her close connection to co-defendant Richard Ayvazyan, as illustrated in significant part through her extensive text message exchanges with him regarding the plans for the conspiracy, underscored the government's position that defendant Tamara Dadyan was responsible through her integral role in the conspiracy for the 151 loan applications.  (Id.)  As described in section II.A above, the text messages (not to mention the volumes of physical evidence found at her home) starkly illustrate defendant Tamara Dadyan's extensive knowledge of and involvement in the central aspects of the conspiracy which ultimately comprised 151 loan applications.

Fourth, defendant Tamara Dadyan also mistakenly claims that by advising her to sign the factual basis (which stated that 151 fraudulent loan applications were submitted as part of the conspiracy), Mr. Minassian exposed her to a substantially higher Guidelines range.  (ECF 998 at 7, 10.)  Defendant is wrong: the loss amount for which she is responsible is the same without regard to whether she personally participated in or had direct knowledge of all 151 fraudulent loans applications.  In her plea agreement, defendant Tamara Dadyan stipulated to a loss amount over $9.5 million.  (ECF 525 ¶ 21.)  And when that stipulation was reviewed orally for the Court and in her presence, she did not object.  (June 14, 2021 Hr'g Tr. at 13:21-14:8.)

In addition, it is well-established law that "[defendant's] guilty plea to the conspiracy [counts] allows [her] to be held liable for the entire loss amount reasonably foreseeable within the scope of [her] conspiratorial agreement, and not just for [her] criminal

activity." United States v. Wells, 804 F. App'x 515, 518 (9th Cir. 2020). See also United States v. Treadwell, 593 F.3d 990, 1002–03 (9th Cir. 2010) ("[T]o comply with U.S.S.G. § 1B1.3(a)(1)(B), a district court is not required to proceed item-by-item through a complete list of all losses attributed to a criminal conspiracy and to then make an individualized determination whether or not each item was within the scope of the defendant's 'joint undertaking' and was 'reasonably foreseeable' to that defendant."), overruled on other grounds by United States v. Miller, 953 F.3d 1095 (9th Cir. 2020), cert. denied, 141 S. Ct. 1085, 208 L. Ed. 2d 539 (2021). Indeed the Court applied these same principles when determining the amount of loss for which Tamara Dadyan's co-defendant, Vahe Dadyan, was responsible when sentencing him on October 18, 2021.  Based on the overwhelming evidence of Defendant's guilt as reflected in the digital and physical evidence described above and her close working relationship to co-defendant Richard Ayvazyan at the heart of the conspiracy, the government had (and has) a very strong argument by a preponderance of the evidence that the 151 loan applications were "within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B). Such is the case whether or not the 151 loans were included in the factual basis in defendant's plea agreement.

In any event, the total loss resulting from the number of fraudulent loan applications for which defendant Tamara Dadyan personally participated or had direct knowledge far exceeds the $9.5 million threshold resulting in a 20-level loss enhancement under U.S.S.G. § 2B1.1(b)(1)(K), even without taking into account the

foreseeability analysis for "jointly undertaken criminal activity" under U.S.S.G. § 1B1.3(a)(1)(B).  (Fenton Decl. ¶ 6, Ex. 5 (chart detailing evidence of defendant's participation and knowledge of certain of the 151 fraudulent loan applications).)  The amount of loss in excess of $9.5 million is irrelevant for the purpose of the Guidelines calculation so long as it is below $25 million - which it is here pursuant to the plea agreement from which she seeks to withdraw.

Thus, even if the factual basis did not include a reference to all 151 fraudulent loan applications submitted in furtherance of the conspiracy, defendant Tamara Dadyan's Guidelines range would have been the same.  This fact shows that Mr. Minassian's legal advice was not erroneous.  It also shows that, even if Mr. Minassian's advice had been somehow inadequate, a reasonable person in defendant Tamara Dadyan's position would have still pleaded guilty – taking advantage of the substantial benefits afforded by the plea agreement – even if she had received the proper advice of which defendant Tamara Dadyan now claims she was purportedly deprived. Garcia, 401 F.3d at 1011–12.

Defendant cites a single case – United States v. DeSimone, 736 F. Supp. 2d 477 (D.R.I. 2015) – as authority for the proposition that a district court should grant a motion to withdraw a guilty plea where counsel advises a defendant to agree to a factual basis they both know to be inaccurate.  (ECF 998 at 10.)  Defendant's reliance on DeSimone is misplaced.  Unlike here, DeSimone maintained that he was actually innocent of all the crimes charged and disagreed with the factual basis in all material respects.  Moreover, both DeSimone and his counsel essentially agreed on the key facts underlying the DeSimone's claim of ineffective assistance, including that counsel

23

did not alert the court about DeSimone's real-time disagreement with the factual basis. In this case, however, defendant Tamara Dadyan's version of events is starkly different than Mr. Minassian's recollection and her own statements to the Court under oath. Furthermore, the single issue at the core of her current motion arose as a result of the Court's thorough Rule 11 inquiry, and was resolved in open court to the satisfaction of the Court and without any disagreement from defendant Tamara Dadyan. She further admitted the factual basis a third time when, nearly two months later, she met with Probation for her presentence interview. If anything, DeSimone underscores how and why Defendant fails to satisfy her burden of demonstrating a fair and just reason to withdraw her plea.

Finally, defendant Tamara Dadyan's claim that, on the day of the change of plea hearing, Mr. Minassian "stated that the plea agreement was for a level 23, 46-57 months, or '5.5 years' in prison," (ECF 998 at 8), is belied by the record. The plea agreement, which she signed and certified having read "in its entirety" and "carefully and thoroughly discussed" with her attorney (ECF 525 at 29-30), plainly includes a Guidelines offense level calculation (before a reduction for acceptance of responsibility) of 31 (id. at ¶ 21). During the change of plea colloquy, the Court ensured that defendant Tamara Dadyan had read, understood, and discussed fully the plea agreement with Mr. Minassian. (June 14, 2021 Hr'g Tr. at 5:10-17.) The government summarized salient points from the plea agreement, including the Guidelines calculation resulting in offense level 31 before acceptance of responsibility. (Id. at 13:21-14:8.) And at the conclusion of the hearing, the Court again sought to ensure that defendant was entering her change of plea with her "eyes wide open,"

and she confirmed she was.[12] (Id. at 29:21 – 30:1.)  Defendant's claim
at the eleventh hour that she was informed of the wrong Guidelines
calculation is, as with her other claims discussed above, wholly
unsupported on the record.  United States v. Nostratis, 321 F.3d
1206, 1211 (9th Cir. 2003) (affirming denial of motion to withdraw
guilty plea where defendant moved to withdraw his plea only after
learning from the presentence report that his likely sentencing range
was 135 to 168 months).

**IV.  Conclusion**

     For the aforementioned reasons, the government respectfully
submits that the Court should deny defendant Tamara Dadyan's motion
to withdraw her guilty plea and instead proceed to sentencing her on
November 15, 2021.

---

     [12] Consistent with this record, Mr. Minassian explains in his
responses to the government's interrogatories that he discussed
defendant Tamara Dadyan's Guidelines calculations and sentencing
exposure in this case, including the specific offense level
calculation of 31 that was included in the plea agreement.  (See
Responses to Interrogatory Nos. 8, 9, 18, 19, 20.)