JERRY KAPLAN, ESQ. Bar No. 49142
JOSEPH BENINCASA, ESQ. Bar. No. 251347
Kaplan, Kenegos and Kadin
Attorneys at Law
9150 Wilshire Boulevard Suite 175
Beverly Hills, California 90212
Email: kapkenkd@pacbell.net
Telephone:(310) 859-7700
Facsimile:(310) 859-7773

Attorneys for Defendant
TAMARA DADYAN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| THE UNITED STATES OF AMERICA, Plaintiff, vs. TAMARA DADYAN, Defendant. | CASE NO.   2:20-CR-00579-SVW-4<br><br>**DEFENDANT TAMARA DADYAN'S REPLY TO GOVERNMENT'S RESPONSE TO HER MOTION TO WITHDRAW GUILTY PLEA**<br><br>DATE: NOVEMBER 10, 2021<br>TIME: 1:30 PM<br>COURT: HON. STEPHEN V. WILSON |
|---|---|

Defendant Tamara Dadyan's attorney, Fred Minassian, failed to review any discovery, pinned his hopes on his co-counsel's motions to dismiss the case, and when a panicked Motion to Continue was denied, pressured the defendant to accept a plea agreement that required her to admit an untrue factual basis.[1]

---

[1] Mr. Minassian has been under federal indictment since July 27, 2017 for Conspiracy to distribute controlled substance; Conspiracy to falsify a material fact, engage in witness tampering, and falsify records; Making and using a false writing containing false statements within federal jurisdiction; Making a false

**1**
**DEFENDANT TAMARA DADYAN REPLY TO GOVERNMENT'S RESPONSE TO HER MOTION TO WITHDRAW HER GUILTY PLEA**

Notwithstanding the government's claim that the evidence against her was "overwhelming", the defendant should not have been permitted to admit to an untrue factual basis and should have been permitted to plead guilty to the charges of which she was actually guilty and proceed to trial on the remaining counts. Due to the dereliction of her counsel she now faces a significantly higher sentence and should be permitted to withdraw her plea and proceed to trial.

Date:   November 3, 2021              Respectfully submitted,

     /s/ Jerry Kaplan
JERRY KAPLAN
Attorneys for Defendant
TAMARA DADYAN

---

statement to a law enforcement officer; and Falsification of records.  2:17-cr-00480-PSG-6, USDC, Central District of California.

**2**
**DEFENDANT TAMARA DADYAN REPLY TO GOVERNMENT'S RESPONSE TO HER MOTION TO WITHDRAW HER GUILTY PLEA**

## I.

## TIMELINE OF EVENTS

The following timeline of communication between the defendant and Mr. Minassian, and between Mr. Minassian and the government, show that Mr. Minassian was wholly unprepared for trial and desperately sought to get the defendant to plead to an improper plea agreement.

November 5, 2020.  Defendant is arrested on a criminal complaint.

November 17, 2020.  Indictment filed against the defendant and three co-conspirators, which included her husband, Artur Ayvazyan, and her brother-in-law, Richard Ayvazyan.

December 6, 2020 and January 13, 2021.  Mr. Minassian accesses the Steptoe database and views a grand total of two (2) items (Bates 94 and 16828) and downloads the audio recording noted by 16828.  The recording is less than 5 minutes long.

These two items are the only discovery accessed by Mr. Minassian from the database for the entirety of his representation of the defendant.  (Exhibit A).

February 18 and February 24, 2021.  Bank of the West released to the defendant $100,000 from accounts that had been froze by the government.  (See Exhibit E).  Mr. Minassian told Ms. Dadyan to deposit the monies into her Trust account to protect it from the government seizing it.  Ms. Dadyan gave the money to Mr. Minassian's Trust account.  To date, he has retained these funds despite the fact that these monies are part of the loss calculation and likely restitution order, and he has informed Ms. Dadyan that he was using that money for attorney's fees.

March 9, 2021.  The First Superseding Indictment was filed, adding four (4) new defendants and twenty-one (21) new charges.

March 15, 2021. The defendant and co-defendant Artur Ayvazyan move to suppress evidence seized pursuant to warrant. Contrary to the government's assertion, no discovery had been reviewed by the defendant by this date. The motion was prepared by counsel for Artur Ayvazyan, and Mr. Minassian merely joined the motion. Indeed, Mr. Minassian did not file a single motion excepting a stipulation to continue. (Exhibit B)

March 29, 2021. The government files an Ex Parte motion seeking to prevent the defendants from accessing discovery. The Court set the hearing for April 2, 2021.

April 1, 2021. The defendant texts Mr. Minassian regarding the next day's hearing on the government's discovery motion: "I have to say tomorrow that I never saw the discovery. And I don't have access just FYI. So I couldn't have possibly used anything from there." (Exhibit C, p. 8)

April 2, 2021. The Court denies the government's request for a stricter protective order.

April 28-30, 2021. Mr. Minassian contacts the government to request a "reverse proffer" where the government would show the defendant and Mr. Minassian what evidence they have against Ms. Dadyan. Defendant is informed and believes that this meeting was called off after Mr. Minassian joined a motion to dismiss the case for prosecutorial misconduct, pursuant to government policy. No plea negotiations are held. (Kastigar Hearing, Day 2, 87:10-22).

May 21, 2021. The court denies permission for the defendant to join the Kastigar motion.

May 22, 2021. Mr. Minassian texts Ms. Dadyan stating "Call me please important." (Exhibit C, p. 21). They plan to meet on May 26, presumably to discuss the way forward after the denial of the Kastigar motion. Mr. Minassian told Ms. Dadyan that he had spent the $30,000 on a "contact" that would remove the 1028A charge. Despite the fact that trial was

scheduled 3 weeks away, Mr. Minassian still did not talk about a plan for trial or show the defendant any discovery.

June 1-2, 2021.  Mr. Minassian expresses by text that he is concerned about trial and wants to withdraw from the newest suppression motions so he can negotiate with the government for a plea.  (Exhibit C, p. 24-25).  Ms. Dadyan states that she doesn't understand why they are accusing her of "150 loans":  "I only got loans on my business I don't sell their houses or did their loans none of this shit."  (Exhibit C, p. 27).

June 7, 2021.  Mr. Minassian texts to Ms. Dadyan "Tammy jan good morning.  Time is running out.  We need to approach the government again."  (Exhibit C, p.23).

June 8, 2021.  Ms. Dadyan requests that Mr. Minassian begins working on a Motion to Continue.  She states "Fred sorry but only ask for continuance because we're not ready we were in jail that's it I haven't seen discovery or interviewed any witnesses.  Do not mention severance.  He won't grant per Jerry."  Mr. Minassian replies: "I agree."[2]  (Exhibit C, p.33-34).

Thursday, June 10, 2021.  Mr. Minassian contacts the government and requests a phone call to discuss a possible plea.  Trial is set to begin on Monday, June 14.  This is the first request for plea negotiations since the start of the case.

Also on June 10, 2021, Mr. Minassian asks Ms. Dadyan to give him a spreadsheet showing which loans she was a part of.  She emails him the spread sheet.  (Exhibit D).  She advises him that she wasn't involved in all the loans they thinks she was and the following text exchanges follows:

FM: "Tammy on the text messages you are admitting to more than 3 loans."

---

[2] Notably, Mr. Minassian does not deny that she hasn't seen any discovery and that no witnesses have been interviewed.

TD: "That doesn't mean it's there on it and I never ever ever ever received nothing. I don't know the companies that are on the indictment. I will mark every one I know about. But like what tutu [do you] want me to do sag [sp?] it belongs to rich?"

FM: "Please I need a complete list by 9pm tonight. We need to say that. Email me the indictment."

TD: "Yah I'll say I know this company but have nothing to do with it if I know it."

FM: "Yes."

TD: "But that's bsbe [BS] which ever I know I'll say

FM: "Ok."

(Exhibit C, p.35-36).

Later the discussion continues with Mr. Minassian stating that the loss amount can't be reduced "even if Rich got all the $". Ms. Dadyan states:

TM:    "Listen I didn't get 1.5 million or 3. What are yurt[you] saying. Manuk took a plea for 3 million because he did get that plus more"

FM:    It's from my contact[3]

TM:    "Clearly u know I didn't get that much."

(Exhibit C, p. 37).

She tells Mr. Minassian that she never got any of the money, that she didn't do the loans or she would've gotten a commission, and that she only knows about Vahe's loan, Tom's loan, Art's loan, and her loan. "I don't know the arman guy Edward…93k Art send and 200 or 202 I send to Richard. And art told him about Tom gave him $73,500 from his loan for the

---

[3] Mr. Minassian repeatedly told Ms. Dadyan he had a "contact" with the United States' Attorneys office that would get her a better deal if she paid him extra money.

joint venture…but he died….I don't want to be a punk but it was Rich's shit in my house also so not fair me and art have to fucked because we don't have loads of cash….let's not forget we owed him [Richard] money so we had to pay him so the amounts we got we send to him. Directly me 200 art 93.  So wtf.  Plus we didn't conspire with them since no I had my loans early and only send to him when he said his buying a house needs his money." (Exhibit C, p.38-40).

On Saturday, June 12, 2021, Ms. Dadyan denies being involved in 21 million of loans and Mr. Minassian tries to reassure her "we still going to negotiate a better deal." (Exhibit C, p. 43).  He also tells her that she will be treated differently than Richard.  (Exhibit C, p. 44).

TM:     "This is seriously insane."

FM:     "But we can argue down."

(Exhibit C, p. 45).

TM:     "Why can't I do a open plea?"

FM:     "Because you would get killed!...Wilson will kill you please listen to me I have your best interest."

(Exhibit C, p. 48).

Ms. Dadyan again asks about an open plea for her and her husband and again is rebuffed:

TM:     "Why can't I do a open plea.  I will take responsibility for my own actions and loans.  There is absolutely no way I'm going to agree to their bullshit that him Manuk and Hayrapetyan did no way."

FM: "Tammy Jan.  Because they will still go to trial on the other counts including count 33…To plead open means you have to enter a guilty plea to all counts wow on [Wilson]

7
**DEFENDANT TAMARA DADYAN REPLY TO GOVERNMENT'S RESPONSE TO HER MOTION TO WITHDRAW HER GUILTY PLEA**

will not accept any other way.  Then we are going to trial on Tuesday and you are risking 20 plus years….Please understand this will give us a chance to argue that you accepted responsibility...Pleading open means you have to say guilty to every single count!!!"

(Exhibit C., p. 49-51)

Sunday, June 13, 2021:

FM:     "Tammy jan you go to trial you will lose your life.  This way we have a chance for a lower sentence."

TM:     "They need to understand that and I didn't do the loans."

FM:     "We will argue that."

(Exhibit C, p. 54).

TM:     "I never have any association with any of this fucking properties they want me to take this fucking hit of 12 Million?"

(Exhibit C, p. 59).

TM:     "We don't have to take the plea deal."

FM:     "Tammy jan I don't know.  You guys can't plead open! The 4 of you are looked at differently."  (Exhibit C, p. 60-61).

On Monday, June 14, 2021, at 9:55a.m., 35 minutes before the deadline, the following exchange took place:

TM:     "I'm being forced to sign something I didn't do I'll pay all the loans I have done nothing to do with their 9 to 20 million period."

FM:     "Tammy jan.  We need to go over the factual basis.  If Wilson says no then we are going to trial…We can't allow this deal to fall apart." (Exhibit C, p. 65).

Ms. Dadyan signed the agreement and entered the plea a few hours later.

8
DEFENDANT TAMARA DADYAN REPLY TO GOVERNMENT'S RESPONSE TO HER MOTION TO WITHDRAW HER GUILTY PLEA

## II.

## THE CONDUCT OF DEFENDANT'S COUNSEL FELL BELOW THE STANDARD OF CARE REQUIRED OF THE SIXTH AMENDMENT AND SHE SHOULD BE PERMITTED TO WITHDRAW HER PLEA[4]

But for her counsel's failure to review the discovery with her and prepare for trial, to negotiate with the government in a timely manner, and his insistence that she enter a plea they both knew required her to admit facts that were untrue, the defendant would have not entered the plea and instead pleaded open only to those counts of which she was guilty and went to trial on the rest of counts. She would have admitted her conduct in her own loan and that of her husband and cousin, and would have denied participating in the loans of her brother-in-law, the mastermind of the conspiracy, and shown that the money she sent to him was money she owed him that he requested be paid for his property purchase. Because her counsel's conduct fell below the reasonable standard of care, she was denied her constitution right to counsel and to trial. Wherefore her Motion to Withdraw her plea should be granted.

A. COUNSEL FAILED TO REVIEW DISCOVERY OR CONDUCT INVESTIGATION

Although Mr. Minassian claims he thoroughly reviewed the discovery and spent 30 hours per week on this case, this is clearly a lie. In addition to admitting such directly to his client, he accessed the discovery database only two times for two documents, out of over 200,000 documents. In addition, when his client noted that they needed a continuance because

---

[4] In defendant's Motion, Mr. Minassian is accused of misadvising Ms. Dadyan on the guideline range of her plea, stating that it was for a level 23 and 46-57 months plus 2 years, or 5.5 years, in prison. While this text exchange did occur, upon a subsequent reading of the text exchange, defense counsel realized that Mr. Minassian was discussing his counter offer to the government, and not the actual plea agreement. Counsel apologies and withdraws this particular accusation.

DEFENDANT TAMARA DADYAN REPLY TO GOVERNMENT'S RESPONSE TO HER MOTION TO WITHDRAW HER GUILTY PLEA

she hadn't seen any discovery and they hadn't interviewed a single witness, Mr. Minassian stated "I agree."

The government argues in its opposition that Mr. Minassian could not have filed a Motion to Suppress without having reviewed the discovery. This is simply false. First, a Motion to Suppress does not require a review of the evidence uncovered by the search. The very nature of a Motion to Suppress renders the actual uncovered evidence irrelevant to the motion. The question is whether, prior to seizing the evidence, a valid warrant or warrant exception permitted the search and seizure in the first place.

Secondly, and more to the point, Mr. Minassian did not draft the Motion. It was written by counsel for her husband and emailed to Mr. Minassian, which he promptly emailed to his client. In fact, Mr. Minassian did not author a single motion or filing excepting only a joinder to another defendant's motion or stipulation to continue. He admittedly permitted the attorney for Richard Ayvazyan to lead the case and prepare and file all the motions.

The closest Mr. Minassian came to reviewing discovery was when he requested a reverse proffer so the government could present the relevant discovery directly to his client. However, this proffer never happened and so Ms. Dadyan never reviewed any discovery with her attorney. In short, Mr. Minassian was wholly unprepared for trial and within 2 hours of the continuance being denied, he contacted the government and tried to quickly get a plea to avoid trial. Mr. Minassian even failed to mention or discuss with the defendant the potential impact her plea would have on her husband's case, which the Court specifically noted in the plea colloquy to Ms. Dadyan.

B.     **COUNSEL PRESSUED DEFENDANT TO ADMIT AN INCORRECT FACTUAL BASIS**

The government, and likely Mr. Minassian, argue that Ms. Dadyan was guilty of at least some crimes, and in fact she is better off with the benefit of the plea rather than going to trial on the counts of which she claims innocence. The Constitution, however, does not treat a guilty plea to a crime that involves incarceration so lightly. The question is not whether she is better off with the plea, the question is whether the guilty plea is true. It contains false statements of facts, and because she was so unduly pressured to sign it, it rendered the plea involuntary. It is irrelevant for this motion whether she will ultimately face a longer prison sentence if she is permitted her constitutionally guaranteed jury trial. What is relevant is that any plea entered before a court of the United States be true, voluntary, and just. This plea agreement is none of those. Unless the government is willing to stipulate that the plea agreement's factual basis and loss calculation are incorrect, it is disingenuous to claim that there is no harm to such false statements remaining in the record.

The loss amount and the factual basis are both false statements of the facts of this case. The truth is that Ms. Dadyan did not participate in anywhere near 151 loans, and she did not participate in a conspiracy involving 21 million dollars. She denies that the factual basis and the loss calculation in the plea agreement are truthful and she has a defense to the crimes to which she does not admit. She very clearly and explicitly told her attorney this, and he very clearly and explicitly told her to plea to it anyway. In the below exchange, after Mr. Minassian tells her that she needs to admit to more than three loans, even though she denies taking part in them, Ms. Dadyan tells him that she'll say the B.S. he's telling her to say, and Mr. Minassian clearly approves:

TD: "Yah I'll say I know this company but have nothing to do with it if I know it."

FM: "Yes."

TD: "But that's bsbe [BS] which ever I know I'll say

FM: "Ok."

(Exhibit C, p.35-36).

The defendant denies that the loss amount in the plea agreement, calculated from all 151 loans, was a reasonably foreseeable loss based on her conduct. The government's opinion notwithstanding, she has a defense to this and very clearly let her attorney know that she wasn't involved in that amount and didn't believe she was legally responsible for it. Indeed, she pleaded with Mr. Minassian to let her do the only honorable thing: plead open to the counts of which she was guilty and go to trial on the rest, rather than admit to a lie in court:

"Why can't I do a open plea. I will take responsibility for my own actions and loans. There is absolutely no way I'm going to agree to their bullshit that him Manuk and Hayrapetyan did no way."

Mr. Minassian, however, not only insisted that she take the deal, but also misadvised her regarding open plea, telling her that the only way to do it was to plead to everything. Whether this was a misunderstanding of the law or another desperate attempt to avoid having to conduct a trial for which he was not prepared is something only Mr. Minassian knows.

C.     **DEFENDANT TIMELY NOTIFIED, HAD A DEFENSE, ASSERTED HER INNOCENCE EARLY ON, AND SUFFERED STRICKLAND ERROR**

The Defendant has met the criteria for withdrawing her plea. She asserted her innocence to some of the charges early on to her attorney – well before the plea agreement was

DEFENDANT TAMARA DADYAN REPLY TO GOVERNMENT'S RESPONSE TO HER MOTION TO WITHDRAW HER GUILTY PLEA

entered into. She has a non-frivolous defense to those crimes and that loss amount. She timely acquired subsequent counsel who immediately notified the court of her intention to withdraw the plea. And she very clearly suffered <u>Strickland</u> error when her counsel failed to prepare the case and then pressured her to sign a plea agreement that he knew contained false statements of fact. But for his dereliction, Ms. Dadyan would have exercised her right to trial. Wherefore the defendant is entitled to have her plea withdrawn and to proceed to trial, and she respectfully requests her motion be granted.

## IV.

## CONCLUSION

Based on the foregoing, the defendant respectfully requests a hearing on this motion and that the Court grant her request to withdraw her plea.

Date:   November 3, 2021                           Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　　　 /s/ Jerry Kaplan
　　　　　　　　　　　　　　　　　　　　　　　　JERRY KAPLAN
　　　　　　　　　　　　　　　　　　　　　　　　Attorneys for Defendant
　　　　　　　　　　　　　　　　　　　　　　　　TAMARA DADYAN