TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
CATHERINE AHN (Cal. Bar No. 248286)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
      1100/1300 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-6527/2424/3819
      Facsimile: (213) 894-6269/0141
      E-mail:    Scott.Paetty@usdoj.gov
                 Catherine.S.Ahn@usdoj.gov
                 Brian.Faerstein@usdoj.gov

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
      1400 New York Avenue NW, 3rd Floor
      Washington, DC 20530
      Telephone: (202) 320-0539
      Facsimile: (202) 514-0152
      E-mail:  Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-579-SVW-4 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT TAMARA DADYAN |
| v. | Date:       November 15, 2021 |
| TAMARA DADYAN, | Time:       11:00 a.m. |
| Defendant. | Location:   Courtroom of the Hon. Stephen V. Wilson |

        Plaintiff United States of America, by and through its counsel
of record, the Acting United States Attorney for the Central District
of California, Assistant United States Attorneys Scott Paetty,

Catherine Ahn, and Brian Faerstein, and Department of Justice Trial
Attorney Christopher Fenton, hereby files its sentencing position
regarding defendant Tamara Dadyan.

The government's sentencing position is based upon the attached
memorandum of points and authorities, declaration of Christopher
Fenton and accompanying exhibits, the revised presentence
investigation report, the files and records in this case, and any
other evidence or argument that the Court may wish to consider at the
time of sentencing.

The government reserves the right to file any supplemental
sentencing positions that may be necessary.

Dated: November 8, 2021          Respectfully submitted,

                                 TRACY L. WILKISON
                                 Acting United States Attorney

                                 SCOTT M. GARRINGER
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 _____/s/_____
                                 SCOTT PAETTY
                                 CATHERINE AHN
                                 BRIAN FAERSTEIN
                                 Assistant United States Attorneys
                                 CHRISTOPHER FENTON
                                 Department of Justice Trial Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

2

# **TABLE OF CONTENTS**

**Contents**

TABLE OF CONTENTS.................................................i

TABLE OF AUTHORITIES.............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.............................1

I.    INTRODUCTION...............................................1

II.   RELEVANT PROCEDURAL HISTORY................................3

III.  DEFENDANT'S OFFENSE CONDUCT................................5

IV.   ADVISORY SENTENCING GUIDELINES CALCULATION.................8

      A.    A Three-Level Aggravated Role Adjustment Should Apply.....9

      B.    A Two-Level Vulnerable Victim Adjustment Should Apply....11

      C.    A Two-level Enhancement in Accordance with U.S.S.G. §
            2B1.1(b)(11) Should Apply................................13

V.    SECTION 3553(a) FACTORS...................................14

VI.   GOVERNMENT'S SENTENCING RECOMMENDATION....................15

      A.    Term of Custody.........................................15

            1.    Nature and Circumstances of the Offense and
                  History and Characteristics of the Defendant (18
                  U.S.C. § 3553(a)(1))...............................15

            2.    Seriousness of the Offense, Respect for the Law,
                  and Just Punishment (18 U.S.C. § 3553(a)(2)(A)).....18

            3.    Affording Adequate Deterrence and Protecting the
                  Public from Further Crimes of the Defendant (18
                  U.S.C. § 3553(a)(2)(B) and (C))....................19

      B.    Supervised Release, Fine, Restitution, Forfeiture, and
            Mandatory Special Assessment............................21

VII.  CONCLUSION...............................................22

1

## TABLE OF AUTHORITIES

2

**CASES**

3
Gall v. United States, 552 U.S. 38 (2007)..........................14

4
Molina-Martinez v. United States, 136 S.Ct. 1338` (2016)..........14

5
United States v. Carty, 520 F.3d 984 (9th Cir. 2008)...............14

6
United States v. Cuellar, 165 F.3d 918 (9th Cir. 1998)
7
        (unpublished)..............................................13

8
United States v. Dadyan, et al., 20-mj-5321 (filed Nov. 3, 2020)....3

9
United States v. Maciel-Alcala, 612 F.3d 1092 (9th Cir. 2010)......13

10
United States v. Ovsepian, 739 Fed. Appx. 448 (9th Cir. October
        5, 2018)...................................................14

11
United States v. Rita, 551 U.S. 338 (2007)........................14

12

**STATUTES**

13
18 U.S.C. § 1956...................................................4

14
18 U.S.C. § 3553(a)...........................................14, 15

15

**OTHER AUTHORITIES**

16
U.S.S.G. § 2B1.1...............................................passim

17
U.S.S.G. § 2S1.1...............................................4, 8

18
U.S.S.G. § 3B1.1...............................................2, 9

19

20

21

22

23

24

25

26

27

28

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3       The government respectfully submits this sentencing memorandum

4   to advise the Court of its sentencing position regarding defendant

5   Tamara Dadyan ("defendant"), who has pleaded guilty to conspiracy to

6   commit wire fraud and bank fraud (Count 1), conspiracy to commit

7   money laundering (Count 26), and aggravated identity theft (Count

8   24).

9       Defendant was one of the ringleaders of a horrendous fraud.  She

10  and her co-conspirators used dozens of fake, stolen, and synthetic

11  identities to steal and launder millions of dollars in COVID-19

12  disaster relief loan funds.  The identities she misappropriated

13  included dead people and elderly local business owners who were semi-

14  retired.  The millions she stole were intended for small businesses

15  and working families who desperately needed the money to survive as

16  the pandemic paralyzed the economy.

17      Defendant's crimes were shockingly callous.  She knew the

18  disaster relief funds she was stealing were finite.  She planned to

19  take as much as she could before the U.S. economy crashed and the

20  federal government ran out of money.  She laughed about the harmful

21  impact her fraud had on the federal government and its disaster

22  relief efforts, including about possibly bankrupting the United

23  States.  And she mocked her victims using words like "idiot" and

24  "fool".[1]

25

26  [1] See, e.g., GEX 10 at 4 ("They r never gonna have enough money
    America needs to file bk"); GEX 10 at 7-8 ("Yah man we need to do the

27  max we can now u understand market Gonna crash[.]  And we can use the
    same names[.]"); GEX 10 at 13 ("No they kept hanging up I will wake

28  up early call[.] I was like on hold for ever bro[.] Kept calling back
    *(footnote cont'd on next page)*

There are compelling reasons applicable to this defendant and this case to impose a significant custodial sentence. As discussed in more detail below (and in the government's response to defendant's Presentence Investigation Report ("PSR") (ECF 1001)), the government generally agrees with several aspects of the United States Probation and Pretrial Services Office's ("USPO") calculation of the advisory Guidelines range as to defendant, except that the government respectfully submits that the advisory Guidelines calculation should include: (1) a three-level aggravating role adjustment based on the fact that she was a manager/supervisor of otherwise extensive criminal activity in accordance with U.S.S.G. § 3B1.1(b); (2) a two-level victim-related adjustment based on the fact that many of her victims were vulnerable and could not protect themselves from defendant's crimes; and (3) a two-level enhancement in accordance with U.S.S.G. § 2B1.1(b)(11). The government therefore believes the applicable guidelines range for defendant on Counts 1 and 26 is 235 to 293 months' imprisonment, based on a total offense level of 38 and Criminal History Category I. A 24-month mandatory consecutive term of imprisonment is also required on Count 24, resulting in an effective advisory Guidelines range for all three counts of 259 to 317 months' imprisonment.

For the reasons stated below, the government respectfully recommends the Court sentence defendant to 259 months' imprisonment, consisting of a low-end sentence of 235 months on Counts 1 and 26 to

---

today was disaster[.] Just like the loan they r giving lol[.]"); GEX 10 at 16 ("But listen this idiot lenders like liberty they don't know about the extension yet."); GEX 10 at 9 ("Let's go the fool is dead on armo land"); GEX at 1 ("Ok so Let's do for all this idiots 10K is 10 k").

2

be served concurrently, and 24 months on Count 24 to be served consecutively to the terms imposed on Counts 1 and 26, for a total custodial sentence of 259 months in prison.  The government further recommends five years of supervised release, restitution in the amount of $17,723,141.26, forfeiture consistent with the Court's previous preliminary orders of forfeiture as to defendant (ECF 872, 876-878), and a special assessment of $300.

## II.  RELEVANT PROCEDURAL HISTORY

On November 5, 2020, defendant was arrested based on a complaint alleging her participation in a massive conspiracy to fraudulently obtain millions of dollars in COVID-19 disaster relief loan funds. (See United States v. Dadyan, et al., 20-mj-5321 (filed Nov. 3, 2020), ECF 1.)  On November 17, 2020, a grand jury returned an indictment against defendant and three co-defendants, alleging one count of conspiracy to commit wire fraud and bank fraud, six counts of wire fraud, and four counts of bank fraud.  (ECF 32.)  On March 9, 2021, a grand jury returned a first superseding indictment against defendant and seven co-defendants, charging defendant with one count of conspiracy to commit bank fraud and wire fraud, eleven counts of wire fraud, eight counts of bank fraud, one count of conspiracy to commit money laundering, one count of aggravated identity theft, and one count of attempted bank fraud based on criminal conduct she allegedly committed while on pretrial release.  (ECF 154.)

On June 14, 2021, pursuant to the plea agreement, defendant pleaded guilty to one count of conspiracy to commit wire fraud and bank fraud (Count 1), one count of conspiracy to commit money laundering (Count 26), and one count of aggravated identity theft

3

(Count 24).  (ECF 525.)  As part of the plea agreement, the parties agreed to the following sentencing factors, which resulted in an advisory Guidelines calculation totaling 31 (before acceptance of responsibility): a base offense level of seven pursuant to USSG §2B1.1(a)(1); a 20-level increase pursuant to USSG §2B1.1(b)(1)(K) for losses greater than $9,500,000; a two-level increase for sophisticated means pursuant to USSG §2B1.1(b)(10); and a two-level increase for a conviction under 18 U.S.C. § 1956 pursuant to USSG §2S1.1(b)(2)(B). (Id. ¶ 21.)  The parties, however, reserved their rights to argue that additional specific offense characteristics, adjustments, and departures under the Guidelines are appropriate. (Id.)

On November 8, 2021, the USPO filed its revised PSR in which it calculated a total offense level of 31 (with respect to Counts 1 and 26, the fraud conspiracy and money laundering conspiracy) and a Criminal History Category I, resulting in an advisory Guidelines range of 108 to 135 months' imprisonment for Counts 1 and 26.  (ECF 1118.)  Taking into account the 24-month mandatory consecutive sentence for Count 24, the USPO thus calculated the effective advisory Guideline range as 132 to 159 months' imprisonment.  The USPO recommends that defendant be sentenced to a term of 132 months' imprisonment (consisting of 108 months on Counts 1 and 26, followed by the mandatory consecutive 24-months sentence on Count 24), five years of supervised release, restitution of $17,723,141.26, and a $300 mandatory special assessment.  (ECF 1117.)

The government addresses its objections to the PSR (supplementing the objections it timely filed on September 27, 2021

4

(ECF 1001)) and discusses the reasons for its recommended sentence in Sections IV and V below.[2]

## III. DEFENDANT'S OFFENSE CONDUCT

The below summary of defendant's offense conduct is based on facts stated in the parties' plea agreement (ECF 525) and the revised PSR ¶¶ 24-44 (ECF 1118), and includes factual revisions as noted in the government's response to the PSR (ECF 1001 at 13-14).[3]

Beginning in or about March 2020 through at least August 2020, defendant agreed with her husband, co-defendant Artur Ayvazyan; her brother-in-law, co-defendant Richard Ayvazyan; her sister-in-law, co-defendant Marietta Terabelian; her cousin, co-defendant Vahe Dadyan, and others to submit fraudulent applications for loans through the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program to lenders, including numerous federally-insured financial institutions and the United States Small Business Administration ("SBA").

Defendant and her co-conspirators used (or caused to be used) dozens of stolen, fictitious, and synthetic identities of other individuals in order to submit fraudulent applications for EIDL and PPP loans and launder the funds (see, e.g., GEX 10, 13.b, 13.c, 13.d, 13.e, 13.f, 13.h, 24.a, 24.b, 24.d, 24.e, 57.a, 57.c, 57.d, 57.e, 57.f, 57.g, GEX 115, GEX 116).  The names used included dead people (e.g., Nazar Terabelian, Olaf Landsgaard, Alak Mikaelian), elderly

---

[2] Defendant filed a motion to withdraw her guilty plea (ECF 998), which the government has opposed (ECF 1092).  The hearing on defendant's motion is currently scheduled for November 10, 2021, and her sentencing is currently scheduled for November 15, 2021.

[3] Facts taken from sources other than the plea agreement, the revised PSR, or ECF 1001 are noted in separate parenthetical citations.

5

1    individuals who owned local businesses whose names were stolen (e.g.,
2    Jack Runyan, Mark Zindroski, Donald Sabala), foreign exchange
3    students who spent only months in the United States and then never
4    returned (e.g., Anna Dzukaeva, Viktoria Kauichko, Liudmyla Kopytova,
5    Anton Kudiumov, Iuliia Zhadko, Medet Murat), and dozens of other
6    synthetic or stolen individual identities and fictitious or
7    misappropriated business names (e.g., Roza Avakian, Hagop Bartoumian,
8    Mykhail Diuzhenko, Ara Haritunian, Armen Inijian, Diana Saakyan,
9    Leoncio Galver, Am & Am Financial Services, Continual Closings,
10   Escrow Doc Co., Fiber One Media, LK Design, MD Acquisition Services,
11   Meds Abrank, Montadrath, Mod Interiors Inc., New Acre Farm Produce
12   Inc., Runyan Tax Service Inc., Sabala Construction, Six Star Farms
13   Inc., Top Quality Contracting).  This was all in addition to
14   defendant's use of her own name and names belonging to her family
15   members (e.g., Greta Akopyan, Artur Ayvazyzan, Arsen Dadyan, Vahe
16   Dadyan), as well as businesses that they actually owned (e.g., ABC
17   Realty Advisors Inc., ABC Legal Services and Management, Allstate
18   Towing and Transport LLC, Green Label Nutrienrs, Secureline Realty
19   and Funding Inc., Voyage Limo LLC, V&D Limo) to perpetrate the fraud.
20   (See generally ECF 1092-6 (a chart titled "Loans for Loss Calculation
21   – Artur Ayvazyan and Tamara Dadyan", which was submitted to the USPO
22   in connection with its preparation of the PSR and produced to defense
23   counsel).)

24        Defendant was one of the architects of an assembly line used to
25   prepare and submit these fraudulent loans.  Her integral role is
26   exemplified by, among other things, the text messages sent from her
27   phone to co-defendant Richard Ayvazyan, which showed that she

28
                                    6

explicitly discussed plans for the conspiracy with co-defendant Richard Ayvazyan, including how to submit PPP and EIDL applications; how to obtain Employer Identification Numbers ("EINs") for businesses; and how to create fake payroll reports. Her role is further illustrated by the evidence on her husband and co-defendant Artur Ayvazyan's phone, which she admitted was used to create false and fictitious documentation to support fraudulent disaster relief loan applications.

In addition, defendant admitted that the voluminous records and items found at her residence, at which she lived with her husband and co-defendant Artur Ayvazyan, included further evidence of her role in the conspiracy including fake identification documents; fraudulently obtained credit cards purporting to belong to fake, synthetic and stolen identities including names used to apply for PPP and EIDL loans; checks and checkbooks in the names of individuals and businesses who applied for PPP and EIDL loans; copies of PPP and EIDL loan applications including in her own name and the names of others; and fake and stolen notary stamps and seals belonging to state and federal courts.

The conspiracies were carried out using sophisticated means, including the use of fictitious businesses, stolen and synthetic identities, a network of bank accounts opened in the names of those fraudulent identities and businesses, and the production of fraudulent documents including false identity documents. Defendant used coordinated and repetitive steps to carry out and conceal the scheme, including falsifying tax and payroll documents and using bank accounts with deceptive names to conceal the nature, location,

source, and ownership of PPP and EIDL loan proceeds.  Among other things, defendant and her co-conspirators laundered the money by purchasing luxury homes on behalf of members of the conspiracy.

**IV.   ADVISORY SENTENCING GUIDELINES CALCULATION**

Pursuant to the plea agreement, defendant pleaded guilty to one count of conspiracy to commit wire fraud and bank fraud (Count 1), one count of conspiracy to commit money laundering (Count 26), and one count of aggravated identity theft (Count 24).  (ECF 525.)  As part of the plea agreement, the parties agreed to the following sentencing factors, which resulted in an advisory Guidelines calculation totaling 29 (including the two-point reduction for acceptance of responsibility):

- a base offense level of 7 pursuant to USSG §2B1.1(a)(1);
- a 20-level increase pursuant to USSG §2B1.1(b)(1)(K) for losses greater than $9,500,000;
- a two-level increase for sophisticated means pursuant to USSG §2B1.1(b)(10); and
- a two-level increase for a conviction under 18 U.S.C. § 1956 pursuant to USSG §2S1.1(b)(2)(B).  (Id. ¶ 21.)

The parties reserved their rights to argue that additional specific offense characteristics, adjustments, and departures under the Guidelines are appropriate.  (Id.)

The revised PSR correctly applied a two-level enhancement because the offenses involved more than 10 victims in accordance with USSG §2B1.1(b)(2), for an advisory Guidelines calculation totaling 31 (including the two-point reduction for acceptance of responsibility). (ECF 1118.)

8

The government respectfully submits that the following adjustments and enhancement should also apply: (1) a three-level aggravating role adjustment based on the fact that defendant was a manager/supervisor of otherwise extensive criminal activity in accordance with U.S.S.G. § 3B1.1(b); (2) a two-level victim-related adjustment based on the fact that many of defendant's victims were vulnerable and could not protect themselves from defendant's crimes; and (3) a two-level enhancement in accordance with U.S.S.G. § 2B1.1(b)(11).  (ECF 1001.)  The government therefore believes the applicable guidelines range for defendant on Counts 1 and 26 is 235 to 293 months' imprisonment, based on a total offense level of 38 and Criminal History Category I.  A 24-month mandatory consecutive term of imprisonment is also required on Count 24, resulting in an effective advisory Guidelines range for all three counts of 259 to 317 months' imprisonment.

### A.   A Three-Level Aggravated Role Adjustment Should Apply

The government respectfully submits that a three-level adjustment should apply to reflect defendant's role as a manager or supervisor of the crimes for which she pleaded guilty.  (ECF 1001 at 3-7.)  In the addendum to the PSR (ECF 1119), the USPO did not appear to disagree about defendant's role as a manager or supervisor of the fraud conspiracy but did disagree about her role with respect to the money laundering conspiracy (which, according to the USPO, is determinative of the applicability of the adjustment).

The evidence of defendant's management and supervision of the money laundering conspiracy is overwhelming.  Defendant's home contained blank checks and other records for dozens of bank accounts

that received stolen COVID-19 disaster relief money (GEX 57.g), as well as handwritten notes relating specifically to the movement of criminal proceeds and funds relating to identities associated with the fraud. (GEX 57.f, 57.h.)  Defendant's phone similarly contained digital photographs of checks in the names of Anna Dzukaeva, Diana Saakyan, Montadrath, and Am & Am Financial Services, all of which were identities and business names used to obtain fraudulent PPP and EIDL loans (GEX 13.c).  This evidences her role managing and supervising the flow of criminal proceeds between bank accounts opened using fake, stolen or synthetic names.

Defendant's phone also contained detailed text messages with co-defendant Richard Ayvazyan further showing her role in managing and supervising the flow of criminal proceeds, including with respect to co-defendants Artur Ayvazyan and Vahe Dadyan. For example, on July 14, 2020, defendant exchanged numerous texts with co-defendant Richard Ayvazyan demonstrating her intimate knowledge of both her own and co-defendant's Richard Ayvazyan's various accounts as part of her effort to make arrangements to pay co-defendant Vahe Dadyan his cut of the criminal proceeds.  (GEX 10 at 21.)  Among other things, she suggests she could direct co-defendant Artur Ayvazyan to deposit co-defendant Vahe Dadyan's cut of the criminal proceeds on his behalf. (Id.)

In another example, from September 16, 2020 through September 30, 2020, defendant repeatedly texted with co-defendant Richard Ayvazyan about her efforts to establish new bank account and move money while they were dealing with the freezing and closure of numerous accounts. (GEX 10 at 33-35.)  Again, defendant specifically

speaks about directing co-defendant Artur Ayvazyan to assist in
helping to launder funds.  (GEX 10 at 35 ("Rich we need ur help this
fuckjng capital one restricted the account that I finally opened[.]
They want to call the employer or employer Human Resource[.]  I tried
giving another cell so Art can verify the check they said the number
is not a[.]  Getting verified as that business number[.]").  These
text messages are consistent with the physical evidence seized at
defendant's home and the other digital evidence discovered on
defendant's phone showing that she had intimate knowledge of and
control over bank accounts involved in the receipt and transfer of
criminal proceeds, and demonstrates her role as a manager and
supervisor of the money laundering scheme.  (See also ECF 1001 at 5-6
(describing defendant's role in arranging to launder her cut of a
fraudulent loan submitted on behalf of an unindicted co-
conspirator).)

**B.   A Two-Level Vulnerable Victim Adjustment Should Apply**

The government respectfully submits that a two-level "vulnerable
victim" adjustment applies based on the use of names belonging to
deceased individuals and foreign visitors.  (ECF 1001 at 3-7.)  In
its addendum to the PSR (ECF 1119), the USPO disagreed with the
government's position on the basis that, in the USPO's view, there is
a lack of sufficient evidence to support a vulnerable victim
enhancement as it relates to the money laundering conspiracy (which
again, according to the USPO, is determinative of the applicability
of the adjustment).  Defendant, however, used the names of deceased
individuals and foreign visitors in connection with both the fraud
and money laundering conspiracies.

1    For example, defendant's phone contained a fake driver's

2    license, fraudulent loan applications, and checks in the name of Anna

3    Dzukaeva (GEX 13.b, 13.c, 13.d), who visited the United States in

4    2015 and never returned (GEX 44 at 7).

5    Similarly, the text messages further show defendant and co-

6    defendant Richard Ayvazyan conspiring to use the identity of "alak"

7    to submit fraudulent loan applications, noting "Let's go the fool is

8    dead on armo land". (See GEX 10 at 9.) When asked if she had

9    accounts in his name, defendant responds, "Yes wells" followed by a

10   message titled "You're one step away from receiving Paycheck Program

11   Program funds.png." (Id.) This deceased individual's name is

12   further referenced later in the text message conversation when

13   defendant attempts to open a corporate account for Alak, asking,

14   "Rich what bank can I open Corp account without going to branch" and

15   "There is the new alak Corp we got buy (sic) the stupid wells online

16   shit said come to branch". (GEX 10 at 20.) Defendant's success in

17   establishing this corporate account is further discussed when she and

18   co-defendant Richard Ayvazyan are dealing with the freezing and

19   closure of numerous accounts and their attempts to open new ones.

20   (See e.g., GEX 10 at 33-35.) Defendant discusses her success in

21   opening a new account, including her use of a stock purchase

22   agreement to obtain control since the account was opened in her own

23   name but "the Corp online everything belongs to Alak". (GEX 10 at

24   34-35.)

25   In another example, defendant uses the name Olaf Landsgaard,

26   which belongs to a deceased attorney, to launder criminal proceeds

27   from the fraud conspiracy to purchase a residence in the name of

28

"Anton Kudiumov".  The evidence includes an email found on defendant's phone (GEX 13.i), as well as text messages discussing defendant's use of an email account in the name of Olaf Landsgaard in connection with a real estate transaction (GEX 10 at 20, 40).

Substantial evidence shows these identities were used in connection with both conspiracies, including the money laundering conspiracy, and thus the vulnerable victim enhancement should apply. See United States v. Maciel-Alcala, 612 F.3d 1092, 1101-02 (9th Cir. 2010) (explaining that identity theft involving the identities of deceased persons is not a victimless crime and potentially harms the deceased's living friends and family); United States v. Cuellar, 165 F.3d 918 (9th Cir. 1998) (unpublished) (affirming the district court's application of a two-level "vulnerable victim" enhancement where defendant used the identity of a deceased individual to fraudulently obtain a credit card in the deceased's name and noting that the district court had found that the families of the deceased were the vulnerable victims, who were particularly susceptible to defendant's conduct at a difficult time).[4]

### C.   A Two-level Enhancement in Accordance with U.S.S.G. § 2B1.1(b)(11) Should Apply

While defendant is eligible to receive the two-level enhancement under either USSG § 2B1.1(b)(11)(A)(ii), (B)(i), (B)(ii), (C)(i), and/or (C)(ii), the government recommends this Court apply the enhancement based on USSG § 2B1.1(b)(11)(A)(ii), as affirmed in United States v. Ovsepian, 739 Fed. Appx. 448 (9th Cir. October 5,

---

[4] The government also incorporates by reference the additional arguments made in Part III.B of its sentencing memorandum for co-defendant Artur Ayvazyan with respect to the applicability of the vulnerable victim adjustment.

13

2018).  For the reasons set forth in Part III.A.2.b of the government's sentencing memorandum for co-defendant Artur Ayvazyan, which the government incorporates by reference here, the government believes this approach avoids the 'double-counting' issue that is the basis of the USPO's objection to this enhancement in its addendum to the PSR (ECF 1119).  Applying the enhancement based on U.S.S.G. § 2B1.1(b)(11)(A)(ii) thus permits the Court to hold defendant accountable for the multiplicity of authentication features found in the possession of her and her co-conspirators separate and apart from the offense conduct underlying Count 24.

## V.   SECTION 3553(a) FACTORS

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a).  United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008).  The advisory Guidelines range provides the "starting point and . . . initial benchmark" for this Court's consideration of an appropriate sentence.  Molina-Martinez v. United States, 136 S.Ct. 1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)).  Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  United States v. Rita, 551 U.S. 338, 350 (2007).

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence, the Court should consider, among other factors, the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, § 3553(a)(2)(A);

the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B); the need for the sentence imposed to protect the public from further crimes of the defendant, § 3553(a)(2)(C); and the need to avoid unwarranted sentence disparities, § 3553(a)(6).

## VI.   GOVERNMENT'S SENTENCING RECOMMENDATION

### A.   Term of Custody

In light of the relevant 18 U.S.C. § 3553(a) factors, a sentence of 259 months in prison is sufficient, but not greater than necessary, to achieve the goals of sentencing here.

####    1.   Nature and Circumstances of the Offense and History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The nature and circumstances of the offense weigh heavily in favor of a significant sentence of imprisonment within the advisory Guidelines range.  Defendant stole disaster relief funds desperately needed by small businesses and working families to survive a national catastrophe.  She began stealing as soon as the money became available in March 2020, when the country was grappling with a public health crisis and faced the very real prospect of an economic collapse.  And she continued through the height of the pandemic until she was arrested.

In stark contrast to the chaos unfurling around the country, defendant kept meticulous track of the names, accounts, identities, and businesses needed to perpetrate the fraud, coordinating with her brother-in-law on phones and even the gender of the voices needed to convince lenders and banks that the fraudulent loan applications, and the money that flowed from that fraud, were legitimate. (GEX 10.)

15

1    She laughed about the fact that she was stealing disaster relief
2    funds and schemed to steal as much as she possibly could before the
3    country slid into depression and the federal government filed for
4    bankruptcy.  (Id. at 4, 7-8, 13.)

5        Defendant's role in the conspiracies was key and her involvement
6    was integral to the success of the fraud.  In conjunction with
7    Richard Ayvazyan, and in reliance on the active assistance of
8    coconspirators like her husband co-defendant Artur Ayvazyan and
9    cousin co-defendant Vahe Dadyan, defendant operated  the assembly
10   line used to prepare and submit false and misleading disaster relief
11   loan applications in the names of individuals and businesses that did
12   not actually need the money, if they existed at all.  She continually
13   communicated with co-defendant Richard Ayvazyan throughout the
14   conspiracy about all aspects of this process, helping manage,
15   coordinate and propel the fraudulent scheme.  (See, e.g., GEX 10.)
16   She also directed some of the actions of co-defendant Artur Ayvazyan,
17   co-defendant Vahe Dadyan, and at least one other unindicted co-
18   conspirator (who is now deceased).  (GEX 10.)   Her role and the
19   extent of her involvement is underscored by the overwhelming evidence
20   discovered in her home and on her phone.  (See, e.g., GEX 10, 13.b,
21   13.c, 13.d, 13.e, 13.f, 13.h, 57.a, 57.c, 57.d, 57.e, 57.f, 57.g.)

22       The fraud was prolific.  Defendant and her co-conspirators used
23   dozens of fake, stolen and synthetic identities to submit (or cause
24   the submission of) over 150 fraudulent loan applications seeking over
25   $20 million in disaster relief funds and then laundered the stolen
26   money through a vast network of bank accounts opened under false
27   pretenses.  (See generally ECF 1092-6 (a chart titled "Loans for Loss

28
                                    16

1  Calculation – Artur Ayvazyan and Tamara Dadyan", which was submitted
2  to the USPO in connection with its preparation of the PSR and
3  produced to defense counsel).)

4      The impact of defendant's fraud is substantial.  Her actions
5  targeted and exploited the individuals and businesses whose names
6  were used to open bank accounts, apply for loans and create fake tax
7  filings; the lenders who originated the fraudulent loans; the federal
8  agency that funded the loans; the retail banks used to launder the
9  criminal proceeds; and the small businesses and working families who
10 were unable to obtain disaster relief because of defendant's crimes.
11 The government considers these individuals and entities to be
12 victims.  Defendant referred to many of them as "idiots".  (GEX 10.)

13     Nothing explains defendant's action other than pure,
14 unadulterated greed.  Based on the information defendant provided to
15 the USPO, defendant's family successfully immigrated to the United
16 States, she obtained an education, she is in a stable marriage, she
17 lives in a mansion, and she is free of addiction.  (ECF 959 ¶¶ 82-
18 103.)  Consistent with these facts, the USPO has not identified any
19 factors that would warrant a departure from the applicable Guidelines
20 range.  (Id. ¶ 140.)

21     A sentence at the low-end of the advisory Guidelines range of
22 259 months' imprisonment (consisting of 235 months on Counts 1 and 26
23 to be served concurrently and 24 months on Count 24 to be served
24 consecutively to the terms imposed on Counts 1 and 26) is appropriate
25 based on an individualized assessment of this defendant and the
26 circumstances of the extent and nature of her involvement in this
27 prolific and horrendous fraud.

28
                                    17

2. Seriousness of the Offense, Respect for the Law, and Just Punishment (18 U.S.C. § 3553(a)(2)(A))

A custodial sentence within the advisory Guidelines range is also needed in this case to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

As described above, the scope and execution of defendant's crimes and relevant conduct make plain the seriousness of the offense. The context in which the fraudulent scheme was carried out only underscores the gravity of the offenses. Defendant and her co-conspirators sought and stole finite COVID-19 disaster relief funds necessary to the survival of the country's small businesses and working families at the height of the pandemic. The use of multiple synthetic or misappropriated identities, sham business entities, and fraudulent back-up documentation sought to deceive institutional lenders and the federal government as they worked to meet the vital needs of those who were actually in need. The extensive planning and coordination of the scheme which defendant and her co-conspirators carried out against the backdrop of an unprecedented public health and economic crisis reflect a significant lack of respect for the law and the need for just punishment in this case.

Defendant's lack of respect for the law is further underscored by her cruel disregard for the impact her actions had on her fellow citizens and those who were trying to provide aid to them. In her text messages with co-defendant Richard Ayvazyan, defendant provided her unvarnished view, labelling many of her victims as "idiots", laughing about the "disaster" that had befallen the country, and

joking about the possibility that the federal government may run out of money and file for bankruptcy.  (GEX 10.)  Defendant's disrespect for the law appears to be part of a broader pattern of her exploitation of judicial institutions.  Indeed, defendant admitted that when federal agents searched her home in November 2020, they discovered fake and stolen notary stamps and seals belonging to state and federal courts (which included stamps belonging to the United States Bankruptcy Court for the Central District of California). (Declaration of Christopher Fenton ¶¶ 1-2, Exs. 1, 2.)

With these factors in mind, the government respectfully submits that a low-end custodial sentence of the effective advisory Guidelines range of 259 months' imprisonment (consisting of 235 months on Counts 1 and 26 to be served concurrently and 24 months on Count 24 to be served consecutively to the terms imposed on Counts 1 and 26) is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

> 3. <u>Affording Adequate Deterrence and Protecting the Public from Further Crimes of the Defendant (18 U.S.C. § 3553(a)(2)(B) and (C))</u>

There is a strong need in this case to impose a sentence that will specifically deter defendant from committing fraud post-release. Defendant has the knowledge and skills to plan, execute and conceal sophisticated schemes, as demonstrated by her architecture of an assembly line for preparing and submitting fraudulent disaster relief loan applications in this case.  Indeed, her home, her phone, and her husband's phone contained all of the component parts necessary to carry out and conceal such a scheme.  Even in the absence of a

criminal history, in light of her demonstrated sophistication, specific deterrence is a necessary consideration here.

Also relevant to the issue of specific deterrence is defendant's questionable conduct in connection with the USPO's preparation of the PSR. According to the PSR, defendant did not provide complete information about her finances on the mandatory Personal Financial Statement and failed to provide a copy of her tax returns. (ECF 959 ¶¶ 107-108.) In addition, the PSR describes defendant's luxury lifestyle, failures to explain or inconsistencies in statements around income, and assets of suspicious or unknown origin. For example, defendant denied ownership of the Weddington residence, claiming it was leased but failed to provide a copy of the lease. (Id. ¶ 110.) The residence has gone through numerous transfers in ownership that included, among others, herself and her mother, a corporation bearing defendant's name, and two additional individuals. (Id. 959 ¶ 110 and 110(a).) Defendant also owns high-value assets that were not disclosed to the USPO. (Id. ¶ 111.) Defendant owns numerous luxury goods (id.) but the USPO notes that, "[i]t is unknown how she and her husband are maintaining their current lifestyle" and even though defendant "noted that her husband was unemployed . . . in the financial records submitted to the Probation Officer, she noted that he earns over $37,000 a month." (Id. ¶ 120.) Together these facts and representations in the PSR raise significant concerns that defendant may be continuing to conceal assets to obstruct forfeiture proceedings.

There is also a strong need to impose a sentence that generally deters others from stealing disaster relief money earmarked for small

businesses and families in crisis – particularly in light of the fact that the pandemic is ongoing and the possibility that the federal government may continue to provide such assistance in the future.  It is critical to the success of these government programs that others are deterred from doing what defendant did here.  Like the need to promote respect for the law, a significant custodial sentence in a case such as this will signal to other potential wrongdoers that there are serious consequences for exploiting a national emergency such as that brought on by the COVID-19 pandemic.

This case is particularly significant to the government's effort to deter pandemic fraud because it is amongst the most egregious examples prosecuted to date.  It is necessary for potential wrongdoers to understand that, although submitting any number of fraudulent disaster relief loan applications constitutes a serious crime and will likely result in the imposition of a sentence of imprisonment, submitting dozens or hundreds of fraudulent loan applications will result in substantially greater prison time.  In light of the fact that the tools required to commit these crimes, namely Internet access and a bank account, are available to almost anyone, it is critical that the Court send a message that a defendant who is engaged in a vast scheme involving dozens of fake, stolen and synthetic identities, over 150 fraudulent disaster relief loan applications, and a vast network of bank accounts opened under false pretenses, will be sentenced in a way that is meaningfully different.

**B. Supervised Release, Fine, Restitution, Forfeiture, and Mandatory Special Assessment**

The government concurs with the USPO's recommendation that defendant be sentenced to five years of supervised release,

restitution of $17,723,141.26, and a $300 mandatory special assessment.[5]  (ECF 1117.)  The government also recommends that, consistent with the parties' plea agreement, the Court order forfeiture consistent with the Court's previous preliminary orders of forfeiture as to defendant.  (ECF 872, 876-878.)

**VII. CONCLUSION**

For the above reasons, the government respectfully requests that the Court impose the following sentence as to defendant Tamara Dadyan: (i) 259 months' imprisonment, consisting of 235 months on Counts 1 and 26 to be served concurrently and 24 months on Count 24 to be served consecutively to the terms imposed on Counts 1 and 26; (ii) five years of supervised release; (iii) restitution in the amount of $17,723,141.26, (iv) forfeiture consistent with the Court's prior preliminary orders of forfeiture; and (v) a special assessment of $300.

---

[5] The government takes no position on the imposition of a fine.